MAD AUTO WRECKING, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mad Auto Wrecking v. Commissioner
Docket No. 1959-94
United States Tax Court
T.C. Memo 1995-153; 1995 Tax Ct. Memo LEXIS 146; 69 T.C.M. (CCH) 2330; April 5, 1995, Filed *146 Decision will be entered for petitioner. Held: Compensation paid by P to its only two officers/shareholders is reasonable. For petitioner: Mark C. Goldenberg. For respondent: Thomas C. Pliske. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Mad Auto Wrecking, Inc. petitioned the Court to redetermine respondent's determination of deficiencies of $ 230,867, $ 138,718, and $ 166,530 in its 1989, 1990, and 1991 Federal income taxes, respectively. We must decide whether amounts paid by petitioner to its only officers/shareholders are reasonable compensation under section 162(a)(1); respondent determined that $ 1,503,322 of the $ 2,173,000 claimed by petitioner as officers' compensation for the years in issue was unreasonable. [1] We hold that all of the claimed officers' compensation is reasonable. Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. We separately refer to Richard Andrews and Melvin Waier, the officers/shareholders, as Andrews and Waier, respectively. We refer to them collectively as the Shareholders. *147 FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioner's principal office was in Florissant, Missouri, when it petitioned the Court. Petitioner filed a Federal income tax return for each year in issue based on the calendar year and using the cash receipts and disbursements method. 1. Petitioner
Petitioner is a high-volume, wholesale scrap business that purchases wrecked automobiles and dismantles, sorts, and sells most of the automobiles' parts at wholesale. Petitioner crushes each automobile's remaining body and sells the crushed bodies as scrap metal. The fact that petitioner performs both of these functions is unique in the industry in petitioner's area; no competitor within 300 miles performs such an all-inclusive job. Although many of petitioner's competitors sell automobile parts or crush wrecked automobiles in their entirety, petitioner practically stands alone in the industry because it strips each automobile of its parts before crushing the automobile, and it sells the stripped parts. Petitioner is also virtually alone in the industry because *148 it strips the automobiles using an innovative and efficient production-like technique designed to quickly remove the automobiles' sellable parts, such as engines, transmissions, radiators, starters, batteries, generators, air conditioners, carburetors, master cylinders, and power steering pumps. Petitioner uses a customized mobile car crusher to crush the automobile's remaining body. Petitioner's business is mainly performed outdoors, and petitioner is open for business notwithstanding inclement weather such as snow, rain, or excessive heat. Petitioner does not own or rent a permanent place of business; it generally operates on the grounds of two salvage yards with the mutual understanding that petitioner will continually supply the yards with material for their operations. [2] Petitioner stores its disassembled parts at these salvage yards in truck beds that are located on the grounds. *149 2. Petitioner's Owners
Petitioner was formed by the Shareholders in the State of Missouri on June 5, 1979, with the Shareholders transferring $ 100 to it in exchange for separate 50-percent interests. [3] The Shareholders are the only members of petitioner's board of directors and are its sole officers. The Shareholders perform all of petitioner's executive and managerial functions. [4] The Shareholders perform or oversee all of petitioner's manual labor. a. Richard Andrews
Andrews is petitioner's president. He graduated in 1973 from the University of Missouri-St. Louis with a bachelor of arts degree in psychology. Before petitioner was formed, Andrews worked in the construction industry and in the automobile salvage business on a part-time basis while in college. During the years in issue, *150 Andrews worked for petitioner approximately 70 hours per week, 52 weeks a year. Andrews is a devoted workaholic who is totally dedicated and committed to petitioner's business and its success. b. Melvin Waier
Waier is petitioner's secretary and treasurer. He studied mechanical engineering for 1 year before he was drafted into the military. After 2 years of military service, Waier returned to school and received an associate's degree in mechanical engineering. Certain courses that Waier completed in pursuing his degree helped him to develop and improve petitioner's business. The courses provided Waier with a background in mechanics and helped him direct the construction and repair of tools, trucks, and machinery, all of which benefit petitioner's business. During the years in issue, Waier worked for petitioner for approximately 65 hours per week. Like Andrews, but to a slightly lesser extent, Waier is a devoted employee who is totally dedicated and committed to petitioner's business and its success. c. The Shareholders' Relationship Before Petitioner's Formation
The Shareholders informally worked together during the 5-year period before petitioner was formed, using *151 their own equipment to tow and salvage wrecked automobiles. The Shareholders learned during this 5-year period that an automobile scrap business was a viable entity, primarily due to an abundant supply of wrecked automobiles, and updated equipment was essential to a scrap business' growth. With these ideas in mind, [5] the Shareholders agreed to pool their resources and form petitioner. 3. The Shareholders' Compensation from Petitioner
a. Overview
Petitioner has neither a written employment agreement with the Shareholders, nor a written policy concerning their compensation. b. Prior to the Years in Issue
Petitioner paid the following total compensation to each of the Shareholders for the years prior to the years in issue: Year
Compensation
1980
$ 42,200
1981
93,600
1982
74,560
1983
111,840
1984
278,320
1985
304,000
1986
256,000
1987
656,000
1988
1,106,000
*152 This compensation included annual bonuses that petitioner began paying to the Shareholders in 1984. The annual bonuses paid to both Shareholders prior to the years in issue ranged in the aggregate from $ 100,000 to $ 950,000. c. During the Years in Issue
Petitioner paid the Shareholders a base salary of $ 1,500 per week, i.e., $ 78,000 per year, and it paid them bonuses during the second, third, and fourth quarters of each year. Each Shareholder generally received the same amounts as bonuses, except that Andrews received a larger bonus during each year to reflect the fact that he devoted more time than Waier to petitioner's business. The Shareholders' total compensation during the years in issue was: Andrews Waier 1989
Salary
$ 78,000
$ 78,000
2d quarter bonus
50,000
50,000
3d quarter bonus
100,000
100,000
4th quarter bonus
150,000
50,000
4th quarter bonus
100,000
100,000
Total compensation  478,000
378,000
1990
Salary
$ 78,000
$ 78,000
2d quarter bonus
75,000
75,000
3d quarter bonus
100,000
--
4th quarter bonus
100,000
100,000
Total compensation  353,000
253,000
1991
Salary
$ 78,000
$ 78,000
2d quarter bonus
75,000
75,000
3d quarter bonus
40,000
40,000
4th quarter bonus
175,000
150,000
Total compensation  368,000
343,000
*153 4. Petitioner's Operations
a. Early Years and the Shareholders' Work to Improve Petitioner's Operations
Petitioner did not operate efficiently immediately after its incorporation. The Shareholders undertook efforts to improve petitioner's operations and their effectiveness. The Shareholders designed innovative equipment that was tailored to petitioner's business, allowing petitioner to improve its efficiency and profitability. The Shareholders also sought and found companies that sold specialized equipment that would better accommodate petitioner's operations. The innovative and specialized equipment allowed petitioner to remove sellable parts from the automobiles quickly and with minimal labor. Petitioner's purchase of a mobile car crusher, for example, allowed it to bring in 15 to 20 automobiles at a time, rather than the 4 or 5 automobiles that it could bring in without the machine. The Shareholders also changed petitioner's operation with respect to the sale of disassembled parts, allowing petitioner to improve its efficiency and increase its profitability. Prior to the change, petitioner sold its parts to middlemen who resold the parts to wholesalers at higher *154 prices. Starting in or around 1989, the Shareholders eliminated the middlemen in most cases and sold the parts directly to the wholesalers at the higher price. Selling directly to the wholesalers increased petitioner's profit margin on its parts sales. The Shareholders also developed relationships with salvage yards, enabling petitioner to eliminate the costs that it had previously incurred to transport its equipment between job locations and allowing it to minimize the cost of disassembling the automobiles. Prior to the time that the Shareholders developed these relationships, petitioner's work was performed at multiple locations, and petitioner had to move its operations from one location to another. After the Shareholders became primarily affiliated with two salvage yards, petitioner's operations were generally fixed at two yards. Petitioner was stationary during the years in issue, which increased its profits from its earlier years. b. Petitioner's Operations During the Years in Issue
Petitioner's gross receipts (net of returns and allowances), gross income, book income (loss), taxable income (loss), officers' compensation, officers' compensation percentages, and *155 shareholders' equity were (rounded off to the nearest dollar): Gross
Book Net
Taxable Receipts
Income
Net Income
Officers' Gross
Year
(Net)
(Loss)
(Loss)
Compensation
Income 1989
$ 2,554,942
$ 57,257 $ 67,690 $ 856,000
$ 1,459,351
1990
2,169,125
23,951 56,974 606,000
1,186,978
1991
1,884,853
(32,647)
(22,199)
711,000
1,186,458
Compensation
Shareholders' Equity [1]
Shareholders' Equity [1]
Percentages as of Jan. 1 as of Dec. 31
1 2 3 4 34
59
94
93
$ 360,250
$ 417,507
28
51
96
91
417,507
441,458
38
60
105
103
441,458
408,810
1 Officers' compensation divided by gross receipts.
2 Officers' compensation divided by gross income.
3 Officers' compensation divided by book net income (before deducting officers' compensation).
4 Officers' compensation divided by taxable net income (before deducting officers' compensation).
Petitioner's sale of scrap metal to one entity accounted for approximately 63 percent, 63 percent, and 53 percent of its total sales during its 1989, 1990, *156 and 1991 taxable years, respectively. Approximately 90 percent of petitioner's cost of goods sold (wrecked automobiles) was purchased from entities that were entirely or partially owned by the Shareholders (these entities are collectively referred to as the Sellers). Petitioner, through the Shareholders, devoted some of its time to (and performed services on behalf of) the operations of the Sellers. Neither petitioner nor the Shareholders were compensated by the Sellers for these services. c. Petitioner's Employees
Approximately four persons are needed to remove the sellable parts from an automobile, and the disassembling process takes approximately 10 minutes per automobile. During the years in issue, petitioner had seven full-time employees, not including the Shareholders, and it paid them on an hourly basis (hereinafter, these seven employees are referred to as the Other Employees). The Other Employees, who were generally neither specialized mechanics nor college educated, were hired and trained by the Shareholders. The Other Employees performed manual labor, such as disassembling the automobiles and sorting the relevant parts, and did not perform management, sales, *157 or executive functions. The Other Employees typically worked a 40-hour week and received overtime for any additional hours. The Other Employees' were paid annual compensation (including bonuses of up to $ 3,460) ranging from $ 12,350 to $ 41,630. The Other Employees were covered by a group medical plan. The Shareholders did not receive overtime and were not reimbursed for their out-of-pocket expenses incurred on behalf of petitioner. Although the Shareholders were covered by a group medical plan, they did not receive special fringe benefits such as pension plans, profit-sharing plans, company owned automobiles, or disability insurance. During each year in issue, petitioner paid a $ 10,382 premium on $ 1 million of life insurance in the names of each of the Shareholders and for which it was the beneficiary. The cash surrender value of these policies was: Year
Andrews Waier 12-31-88
$ 4,744
$ 4,855
12-31-89
9,023
9,158
12-31-90
13,567
13,729
12-31-91
18,277
18,432
d. Petitioner's Retained Earnings and Its Dividend Policy
Petitioner had retained earnings at the end of its 1980 through 1991 taxable years as follows: Retained
Retained
Year
Earnings
Year
Earnings
1980
$ 76,869
1986
$ 343,136
1981
113,438
1987
345,882
1982
146,565
1988
360,150
1983
284,918
1989
417,407
1984
310,134
1990
441,358
1985
352,020
1991
408,711
*158 Petitioner has never paid a dividend. During the years in issue, petitioner's board of directors discussed the possibility of paying dividends, but decided not to do so. The board decided that petitioner would retain its earnings to further petitioner's growth. 5. Determination of the Shareholders' Bonuses
Petitioner measured its success for each year based on the amount of cash that remained in its bank accounts following the payment of its expenses and a set aside of cash to be used to finance improvements. [6] Petitioner paid most of this "net cash" to the Shareholders as bonuses. From 1984 through the years in issue, petitioner consistently used this criterion for paying bonuses to the Shareholders. OPINION This is another case pertaining to whether amounts paid by a closely held corporation to its shareholders/employees are deductible compensation under section 162(a)(1). Inherently, there is a natural tension *159 between: (1) Shareholders/employees who feel that they are entitled to be paid from a corporation's profits, even to the exhaustion thereof, of an amount that reflects their skills and efforts, and (2) a provision in the tax law that conditions the deductibility of compensation on the concept of reasonableness. What is reasonable to the entrepreneur/employee often may not be to the tax collector. Accordingly, this and other courts are repeatedly asked to examine the relevant facts and circumstances of the business and the underlying employment relationship in order to render an opinion as to whether the compensation paid was reasonable. In so doing, we must be careful not to define the term "reasonable" too narrowly. The dynamic nature of business, the entrepreneurial spirit, and the dedication of purpose all play a role in the composition of reasonable compensation. We must not rigidly apply form over substance when we measure one's contribution to the success of his or her business. Of course, it may be argued that when an individual chooses to conduct business in the corporate form, he or she is obligated to observe all of the corporate formalities inherent in that form, *160 including the standard that to be deductible, the compensation paid must be reasonable. The term "reasonable", however, must reflect the intrinsic value of employees in the broadest and most comprehensive sense. Turning to the facts at hand, respondent disallowed $ 614,136, $ 377,193, and $ 511,993 of officers' compensation deducted by petitioner for its 1989 through 1991 taxable years, respectively. [7] According to respondent, these disallowed amounts are unreasonable. Petitioner disagrees. According to petitioner, all of the amounts paid to the Shareholders are reasonable compensation for the services that they rendered to it. Section 162(a)(1) allows a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. To *161 be deductible under section 162(a)(1), compensation must be both: (1) Reasonable and, (2) paid purely for services rendered to the corporation. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; sec. 1.162-7(a), Income Tax Regs. Petitioner bears the burden of proving respondent's determination of deductible compensation incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); RTS Inv. Corp. v. Commissioner, 877 F.2d 647, 650 (8th Cir. 1989), affg. per curiam T.C. Memo. 1987-98. 1. Was the Compensation Paid by Petitioner Reasonable
Overview
Reasonable compensation is determined by comparing the compensation paid to an employee with the value of the services that he or she performed in return. Such a determination is made with respect to employees individually, rather than with respect to the compensation paid to all employees collectively. Such a determination is a question of fact. RTS Inv. Corp. v. Commissioner, supra at 650; *162 Charles Schneider & Co. v. Commissioner, supra at 151; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). The cases concerning reasonable compensation are numerous and list many factors to be considered in making this factual determination. The factors which may be considered, none of which is controlling in itself, include: (a) The employee's qualifications; (b) the nature, extent, and scope of the employee's work; (c) the size and complexities of the employer's business; (d) a comparison of salaries paid with the employer's gross and net income; (e) the prevailing general economic conditions; (f) a comparison of salaries with distributions to shareholders and retained earnings; (g) the prevailing rates of compensation for comparable positions in comparable concerns; (h) the salary policy of the employer as to all employees; (i) the amount of compensation paid to the particular employee *163 in previous years; (j) the employer's financial condition; (k) whether the employer and employee dealt at arm's length; (l) whether the employee guaranteed the employer's debt; (m) whether the employer offered a pension plan or profit-sharing plan to its employees; and (n) whether the employee was reimbursed by the employer for business expenses that the employee paid personally. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1248 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282; Kennedy v. Commissioner, 671 F.2d 167, 174 (6th Cir. 1982), revg. and remanding 72 T.C. 793 (1979); Charles Schneider & Co. v. Commissioner, supra at 151-152; Mayson Manufacturing Co. v. Commissioner, supra at 119; Estate of Wallace v. Commissioner, supra at 553; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155-1156 (1980); *164 see also Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6; BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5. In analyzing these factors, the Court must carefully scrutinize the facts of a case in which the paying corporation is controlled by the employees to whom the compensation is paid. In such a situation, we must be convinced that the purported compensation was paid for services rendered by the employees/shareholders, as opposed to a distribution of earnings to them that the payor could not deduct. RTS Inv. Corp. v. Commissioner, supra at 650; Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; Charles Schneider & Co. v. Commissioner, supra at 152-153. a. Employee's Qualifications
The Shareholders are exceptionally qualified for petitioner's business, by virtue of their training, experience, and dedication, and understand and control every aspect of petitioner's operations. The Shareholders are also highly motivated and *165 extremely productive employees, and are the primary reason for petitioner's success. We conclude that this factor favors petitioner. The Shareholder's outstanding qualifications jUstify high compensation. Petitioner's profitability rests upon its sales, and the Shareholders' ambition, inventiveness, and energy (as opposed to petitioner's investment in capital) are the primary reasons for petitioner's sales, growth, and success. See Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972). b. Nature, Extent, and Scope of the Employee's Work
The nature, extent, and scope of petitioner's work performed by the Shareholders is fundamental, substantial, and all-encompassing. The Shareholders performed all of petitioner's executive and managerial functions, except accounting, and performed or oversaw all of its manual labor. The Shareholders also supervised petitioner's daily operations, including supervising and directing the Other Employees, and made petitioner's business decisions. Given the vital role played by the Shareholders *166 in petitioner's operations and success, and the long hours that they each dedicated thereto, we view the Shareholders as indispensable to petitioner's business. Petitioner's growth and prosperity is due directly to their skills, dedication, and creativity. If petitioner were to lose either of the Shareholders, it would be in a rough situation until a suitable replacement (if any) could be found. We conclude that this factor favors petitioner. See Elliotts, Inc. v. Commissioner, supra at 1245-1246; Kennedy v. Commissioner, supra at 176; Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, supra at 352-353. c. Size and Complexities of the Employer's Business
Petitioner is a highly specialized company, and its operations demand expertise. Petitioner's business operations could be very complex, but for the simplification that the Shareholders have added to it. Petitioner's gross receipts during the years in issue totaled more than $ 6.4 million. We conclude that this factor favors *167 petitioner. See Elliotts, Inc. v. Commissioner, supra at 1246. d. Comparison of Salaries Paid to Net and Gross Income
The percentage of officers' salaries to gross receipts for 1989, 1990, and 1991 was 34, 28, and 38, respectively. The percentage of officers' salaries to gross income for 1989, 1990, and 1991 was 59, 51, and 60, respectively. The percentage of officers' salaries to book net income (before deducting officers' compensation) for 1989, 1990, and 1991 was 94, 96, and 105, respectively. The percentage of officers' salaries to taxable net income (before deducting officers' compensation) for 1989, 1990, and 1991 was 93, 91, and 103, respectively. These percentages are reasonable in light of the qualifications of the Shareholders and the nature, extent, and scope of their work. We also find relevant the fact that petitioner reported more than $ 55,000 in taxable income during each of 2 of the years in issue notwithstanding its payment of large compensation to the Shareholders. Given the additional fact, however, that petitioner's payment of the bonuses kept corporate taxes at a low level, we conclude that this factor favors neither *168 party. See Paul E. Kummer Realty Co. v. Commissioner, supra at 315 (officers' compensation not reasonable where payment of bonuses kept corporate taxes at a low level). We consider this factor neutral. e. General Economic Conditions
The record does not indicate to what extent petitioner's performance during the years in issue reflected general economic conditions. General economic conditions may affect a business' performance and indicate the extent (if any) of the employee's effect on the company. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119-120 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court. Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during the bad years. We conclude that this factor favors neither party. We consider it neutral. f. Comparison of Salaries with Distributions to Shareholders and Retained Earnings
The absence of a dividend history is a significant factor that may suggest that some of the amounts paid as compensation to a shareholder/employee is really a dividend. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), *169 affg. T.C. Memo. 1985-267. Such an absence may raise a "red flag" that invites special scrutiny of the Court, Edwin's, Inc. v. United States, 501 F.2d 675, 677 n.5 (7th Cir. 1974), and justifies an inference that some of the purported compensation was actually a distribution of profits, Charles Schneider & Co. v. Commissioner, 500 F.2d at 153. Such an absence (and inference), however, does not automatically convert compensation that would otherwise be reasonable into a dividend. Corporations are not required to pay dividends. Instead, an individual shareholder may participate in the success of a corporation through the appreciation in the value of his or her stock brought on by retained earnings and the possibility of a future return. Thus, a corporate employer with little or no dividend history may be able to pay and deduct large amounts of compensation if the Court is convinced that a reasonable person would still have invested in the corporation. Courts sometimes apply a hypothetical investor test to determine whether a reasonable person would have invested in the corporation. Critical *170 to this test is whether the shareholders of the corporation received a fair rate of return (without taking into account any compensation) from the total of their initial and subsequent investments. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; Elliotts, Inc. v. Commissioner, 716 F.2d at 1244; Medina v. Commissioner, T.C. Memo. 1983-253; see also Rev. Rul. 79-8, 1979-1 C.B. 92 (compensation is not unreasonable merely because a corporation pays an insubstantial portion of its earnings as dividends). Respondent determined that part of the compensation paid to the Shareholders was actually a dividend. Respondent argues in her brief that petitioner's failure to pay dividends during its existence indicates that the Shareholders' compensation was unreasonable. We disagree that the compensation was unreasonable. Although petitioner has never paid a dividend during its existence, its choice not to do so stemmed from its board's decision that petitioner needed to retain funds in order to grow. We refuse to second guess the board's wisdom *171 under the facts of this case; we view its choice not to pay dividends as a reasonable business decision. As a point of fact, petitioner invested over $ 286,000 in fixed assets during the years in issue, and its equity grew from the Shareholders' initial contributions totaling $ 100, to $ 408,810 on December 31, 1991. Petitioner's retained earnings also steadily grew from its genesis to $ 408,711 on December 31, 1991. [8] *172 See Comtec Sys., Inc. v. Commissioner, T.C. Memo. 1995-4. In addition to the fact that the increase in petitioner's retained earnings most likely increased the value of its stock, we believe that a hypothetical investor would have considered $ 408,711 in retained earnings to have been a worthy return over the 12- to 13-year period on his or her investment of $ 100. We conclude that this factor favors petitioner. [9]
g. Prevailing Rates of Compensation for Comparable Positions in Comparable Companies
Both petitioner and respondent rely on expert testimony with respect to this factor. Expert testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment. Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). The Court, however, is not bound by an expert's opinion. We weigh an expert's testimony in light of his or her qualifications, and with respect to all credible evidence in the *173 record. Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective portions of it. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Technology v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986). Petitioner's expert is Lawrence J. LeGrand, a tax partner in the manufacturing, retailing, and distribution practice of KPMG Peat Marwick LLP. Mr. LeGrand's clients are mainly closely held businesses, and he specializes in executive compensation. Respondent's expert is E. James Brennan III, president of Brennan, Thomsen Associates, Inc., of Chesterfield, Missouri. Mr. Brennan is no stranger to this Court, having testified before us on no fewer than 10 prior occasions. [10]
*174 We are not persuaded by either of the experts. Mr. LeGrand's testimony was unconvincing because it did not directly address the factor at hand; i.e., the prevailing rates of compensation for comparable positions in comparable concerns. Considering his testimony in its entirety, we find that Mr. LeGrand was retained by petitioner to advocate its position herein. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We are no more convinced by Mr. Brennan. As has been true in a majority of the cases in which he has testified before this Court, his conclusions are not based on data from businesses that are akin to the business at hand, i.e., automobile salvage, automobile disassembling, and the wholesale of scrap metal. See, e.g., BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5; L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187; Thomas A. Curtis, M.D., Inc. v. Commissioner, T.C. Memo. 1994-15; Automotive Inv. Dev. Inc. v. Commissioner, T.C. Memo. 1993-298; Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84: *175 Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, affd. 819 F.2d 1315 (5th Cir. 1987). To restate what we have previously stated with respect to Mr. Brennan's "expert" testimony: "We are not satisfied that a reasonable level of compensation for an executive like * * * [the Shareholders] can be accurately determined by reference to the industries Brennan surveyed because of the absence of significant information on other businesses similar to petitioner's." Thomas A. Curtis, M.D., Inc. v. Commissioner, supra; Diverse Indus., Inc. v. Commissioner, supra.Indeed, comparing compensation paid to officers of companies that differ markedly provides guidance of dubious value. See Diverse Indus., Inc. v. Commissioner, supra; Niaqara Falls Coach Lines, Inc. v. Commissioner, T.C. Memo. 1977-269. We conclude that this factor favors neither party. We consider it neutral.
h. Employer's Salary Policy as to all Employees
The record is unclear as to petitioner's salary policy as to all *176 of its employees. We look to this factor to determine whether the Shareholders were compensated differently than the Other Employees merely because of the Shareholders' status as shareholders. Owensby & Kritikos, Inc. v. Commissioner, supra at 1322-1323. A reasonable, longstanding, and consistently applied compensation plan, for example, is evidence that compensation is reasonable. Elliotts, Inc. v. Commissioner, 716 F.2d at 1247. We conclude that this factor favors neither party. We consider it neutral. i. Compensation Paid in Prior Years
The compensation (including bonuses) paid by petitioner to the Shareholders prior to the years in issue ranged from $ 42,200 to $ 1,106,000. An employer may deduct compensation paid to an employee in a year although the employee performed the services in a prior year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); see also R. J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972), and the cases cited therein. In order to do so, the employer must show: (1) That the employer intended to compensate *177 the employee for past undercompensation, and (2) the amount of the undercompensation. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Petitioner has not argued that, and we are unable to determine whether, any of the payments in issue were intended to compensate either of the Shareholders for his service provided to petitioner in earlier years. We conclude that this factor does not apply. j. Employer's Past and Present Financial Condition
Petitioner grew and became very profitable. Its equity grew from the Shareholders' initial contributions totaling $ 100, to $ 408,810 on December 31, 1991. We conclude that this factor favors petitioner. k. Whether Employer and Employee Dealt at Arm's Length
The Shareholders were purportedly paid high compensation as petitioner's principal employees. Given their relationship to petitioner as its only shareholders, we must inquire whether an independent investor would *178 have paid the Shareholders the amount of compensation that they received during the years in issue. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; see also Elliotts, Inc. v. Commissioner, supra at 1246-1247. We conclude that an independent investor would have done so in view of the nature and quality of the services that the Shareholders performed for petitioner, and the effect of their services on a hypothetical investor's return on his or her investment. We conclude that this factor favors petitioner. In so concluding, we downplay the lack of adherence to corporate formalities shown by petitioner in paying the bonuses to the Shareholders. As the Court observed in Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 714 (1977) (quoting Reub Issacs & Co. v. Commissioner, 1 B.T.A. 45, 48 (1924)), "Closely held corporations, as is well known, often act informally, 'their decisions being made in conversations, and oftentimes recorded not in minutes, but by action.'" See also Levenson & Klein, Inc. v. Commissioner, supra at 713-714 *179 (courts may give little or no weight to the lack of corporate formality in closely held corporations). We also find relevant the following testimony from Waier with respect to the pay differential: Dick [Andrews] is more like a workaholic. And anybody that works that hard has got to be compensated for the work that they do. If you don't do that, your business is going to suffer because the guy that is putting in more hours and not receiving any money -- he is definitely going to reject the idea, not work as hard. And if he doesn't work as hard, I don't receive my salary, too.
l. Whether Employee Guaranteed Employer's Debt
The record does not indicate whether the Shareholders personally guaranteed any of petitioner's debt. Courts have considered whether an employee personally guaranteed his or her employer's debt, in determining whether the employee's compensation was reasonable. In certain situations, an employee's personal guarantee of his or her employer's debt may entitle the employer to pay a greater salary to the employee than the employer would otherwise have paid. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1325 n.33; *180 R. J. Nicoll Co. v. Commissioner, supra at 51; see also Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6; BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5. We conclude that this factor favors neither party. We consider it neutral. m. Absence of Pension Plan/Profit-Sharing Plan
The Shareholders were not participants in any pension plan or profit-sharing plan offered by petitioner. Courts have considered the absence of a pension plan or a profit-sharing plan in determining reasonable compensation. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Kennedy v. Commissioner, 671 F.2d 167, 174-175 (6th Cir. 1982), revg. and remanding 72 T.C. 793 (1979). Such an absence may allow the employer to pay the employee more compensation than the employer would have paid had the employer offered the employee a pension plan or a profit-sharing plan. Rutter v. Commissioner, supra at 1274. We conclude *181 that this factor favors petitioner. n. Lack of Reimbursement of Business Expenses
The Shareholders were not reimbursed for their out-of-pocket expenses incurred on behalf of petitioner. Courts have considered the lack of reimbursement of business expenses in determining reasonable compensation. An employer may pay greater compensation to an employee to reflect the fact that the employee is not being reimbursed for expenses that he or she paid on behalf of the employer. Id. at 1274. We consider this factor neutral, and we give it no weight. The record is insufficient for us to determine the amount of the business expenses paid by the Shareholders during the years in issue for which they were not reimbursed. We also find that the lack of reimbursement was the personal choice of the Shareholders, rather than the policy of petitioner. o. Conclusion on Reasonableness
Most of the factors described above favor petitioner. None favor respondent. We conclude that the $ 478,000, $ 353,000, and $ 368,000 paid to Andrews in 1989, 1990, and 1991, respectively, was reasonable compensation for those years. We conclude likewise with respect to *182 the $ 378,000, $ 253,000, and $ 343,000 paid to Waier in 1989, 1990, and 1991, respectively. 2. Was Compensation Paid for Services Rendered to Petitioner
According to respondent, petitioner is not entitled to deduct all of the compensation paid to the Shareholders because it paid part of this compensation for services that they performed on account of other, related companies (e.g., the Sellers). We disagree. Although the Shareholders provided some services to other related entities, we are unable to find that these services were performed on behalf of anyone other than petitioner. We hold that petitioner paid the Shareholders the compensation in issue for services that they rendered to it. 3. Conclusion
The $ 478,000, $ 353,000, and $ 368,000 paid to Andrews in 1989, 1990, and 1991, respectively, is deductible for those years under section 162(a)(1). The $ 378,000, $ 253,000, and $ 343,000 paid to Waier in 1989, 1990, and 1991, respectively, is also deductible for those years under section 162(a)(1). We have considered all arguments made by respondent and, to the extent not discussed above, find them to be without merit. To reflect the foregoing, Decision *183 will be entered for petitioner. Footnotes
1. Respondent also determined: (1) Petitioner did not have a net operating loss in 1991, that could be carried back to earlier years, (2) petitioner had a $ 954 general business credit for 1988, that it could apply in 1989, and (3) petitioner was not entitled to report an additional $ 3,000 and a $ 344 credit in its 1989 and 1990 taxable years, respectively. Our resolution of the reasonable compensation issue automatically disposes of these other determinations.↩
2. The fact that petitioner did not operate out of its own building is also unique in the industry. By operating on other people's property, petitioner was able to minimize its expenses (as compared to its competitors) by practically eliminating its general administrative expenses such as rent, real estate taxes, and utilities.↩
3. The Shareholders have always owned petitioner equally.↩
4. In connection therewith, petitioner retains an accounting firm to report its payroll, review its financial operations, and prepare its tax returns.↩
5. The Shareholders learned after the formation of petitioner that purchasers of shredded automobiles would pay a progressive pay scale to volume haulers.↩
1. All but $ 100 of the Shareholders' equity is attributable to retained earnings.↩
6. During the years in issue, petitioner purchased fixed assets worth more than $ 286,000.↩
7. More specifically, respondent disallowed $ 339,792, $ 222,253, and $ 254,282 paid to Andrews for 1989, 1990, and 1991, respectively, and $ 274,344, $ 154,940, and $ 257,711 paid to Waier.↩
8. We recognize that petitioner's retained earnings at the end of its 1991 taxable year were $ 32,647 less than at the beginning of that year. Petitioner's gross receipts for 1991, however, were also $ 284,272 less than the prior year.↩
9. In so concluding, we also find relevant the fact that the total bonuses paid to the Shareholders during each year did not bear a relationship to the percentage of stock held by each of them. See Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; see also Kennedy v. Commissioner, 671 F.2d 167, 174-175 (6th Cir. 1982), revg. and remanding 72 T.C. 793↩ (1979).
10. See BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5; L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187; Mortex Manufacturing Co. v. Commissioner, T.C. Memo. 1994-110; Thomas A. Curtis, M.D., Inc. v. Commissioner, T.C. Memo. 1994-15; Automotive Inv. Dev. Inc. v. Commissioner, T.C. Memo. 1993-298; RTS Inv. Corp. v. Commissioner, T.C. Memo. 1987-98, affd. 877 F.2d 647 (8th Cir. 1989); Rutter v. Commissioner, T.C. Memo. 1986-407, affd. 853 F.2d 1267 (5th Cir. 1988); Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84: Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, affd. 819 F.2d 1315 (5th Cir. 1987); Lefkowitz v. Commissioner, T.C. Memo. 1983-356↩.