T.C. Memo. 1999-26


UNITED STATES TAX COURT


HEROLD MARKETING ASSOCIATES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1529-97.                          Filed January 29, 1999.


<u>Held</u>:  Compensation paid by P to its sole
shareholder/CEO was reasonable.


<u>Daniel J. Boivin</u>, <u>Frank R. Berman</u>, and <u>Jeffrey A. Olson</u>,
for petitioner.

<u>Jack M. Forsberg</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, <u>Judge</u>:  Herold Marketing Associates, Inc., petitioned
the Court to redetermine 1992 and 1993 income tax deficiencies of
$246,508 and $247,829, respectively.  The deficiencies stem from
respondent's determination that $700,000 of the $1.2 million in

compensation that petitioner paid to its sole shareholder/chief executive officer could not be deducted under section 162(a).

We must decide whether petitioner may deduct the full compensation of $1.2 million.  We hold it may.  Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  Most dollar amounts are rounded to the nearest dollar.

                         FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the exhibits submitted therewith are incorporated herein by this reference.  Petitioner is an accrual method, calendar year C corporation, the principal office of which was in Eden Prairie, Minnesota, when it petitioned the Court.  Stephan Herold (Herold) has been petitioner's president and chief executive officer since it was founded.  He has been petitioner's sole director since April 1985.

1.  Petitioner's Business History

Petitioner was originally a division of Stan Clothier Co. (SCC), which was primarily a manufacturer's representative for industrial components.  The division that was to become petitioner was a manufacturer's representative for consumer electronics components.  When it was first spun off in 1980, petitioner was named Clothier-Herold Co.  Stan Clothier owned 50 percent of petitioner's stock, and Herold owned the rest.  In

1984, Herold became the sole shareholder, and he changed the company's name to Herold Marketing Associates.

Petitioner was very successful in its early years. Herold recognized as early as the mid-1970's that personal computers would become an extremely successful technology. Later, he identified Apple Computer (Apple) as a company that was destined for success in this fledgling industry. By cultivating relationships with key personnel at Apple, Herold overcame that company's initial resistance to marketing through sales representatives. In 1980, its first year of business, petitioner became Apple's first sales representative with a territory that covered the Dakotas, Minnesota, and western Wisconsin.

Petitioner developed its territory for Apple from annual sales of $1 million in 1980 to $70 million in 1984. In 1984, Apple stopped using sales representatives and terminated its relationship with petitioner. Just before the relationship ended, Apple accounted for 80 percent of petitioner's sales volume.

Herold changed the focus of the company by identifying three of Apple's four largest accounts and concentrating on selling them other electronics products. Petitioner ran into difficulties in 1986, when all three of these key accounts became insolvent. Herold then developed a three-pronged strategy focusing on one major product line in each of three categories: (1) Products that were currently well recognized and in demand, (2) products that were just beginning to become available and for

which Herold foresaw a strong demand, and (3) products that were just beginning to be conceptualized that Herold felt would gain strong market acceptance. By implementing this strategy, petitioner, which had seen its revenue drop to less than $1 million in 1985, achieved sales of over $36 million in 1992 and nearly $44 million in 1993. Around 1992, Herold changed the company's fundamental mode of doing business by ceasing to operate as a sales representative and concentrating on being a distributor. Herold recognized that this strategy involved greater risks, since petitioner would have to finance customer receivables and carry inventories of the products it was selling. He decided these risks would be outweighed by certain benefits. In particular, Herold personally would be able to minimize unproductive time he had been spending at sales meetings for each of the manufacturers whose product lines petitioner had been representing, and petitioner would gain greater leeway to develop its own sales and business strategies.

Another significant event in 1992 was petitioner's loss of its largest customer, Gateway Computers, which had accounted for 18 percent of petitioner's sales. This occurred at a time when the computer industry in general was in a minirecession. Despite this setback and amid adverse conditions, petitioner achieved sales growth of more than $12 million in 1992, a 50-percent increase over 1991, and further growth of nearly $7.7 million in 1993, a 21.25-percent increase over 1992.

At the time of trial, a potential buyer had offered $25 million for Herold's stake in petitioner and was engaged in due diligence.  At that point, Herold had not accepted the offer.

## 2.  Petitioner's Owner

Herold was born and raised in Iowa.  He joined the U.S. Navy upon graduating from high school and received training in various categories of complex electronic communications and navigation equipment.  After his discharge from the Navy, Herold held a series of jobs with electronics companies such as Control Data and Univac.  In the course of these jobs, he developed computer programming and diagnostic skills.

In late 1960, Herold began working at Dayton-Hudson and evolved a role in which he acted as an internal management consultant, interviewing company executives, reviewing operations, and recommending improvements for various business units of Dayton-Hudson around the country.  While working full time for Dayton-Hudson, Herold attended the University of Minnesota and earned a bachelor's degree in 3 years.  He later began but did not complete a master's degree in business administration.  At that point, a number of graduates of nationally recognized M.B.A. programs were Herold's subordinates at Dayton-Hudson and, observing them, Herold was not convinced that additional academic studies would be worth the investment of his time and energy.

Herold left Dayton-Hudson for a position as an account executive at SCC in 1972.  This was his first sales-related

position.  He was hired to help SCC diversify into consumer electronics.  Within 2 years, SCC had established a separate consumer electronics division, with Herold as vice president. This was the division that was eventually spun off with Herold first as co-owner and eventually sole owner and that is the petitioner in this action.

Herold is a workaholic, sometimes working 60-70 hours a week.  At one point, his workaholism contributed to a marital breakup.  He is also a micromanager, involved in all aspects of the company's operations.  For example, he personally interviews every new employee and determines and distributes each employee's annual bonus.  He is responsible for every business plan at the company.  He personally reviews every major sale, does the sales forecasting and sales reporting, and has designed petitioner's sales report.  The success of petitioner's business derives almost entirely from its relationships with manufacturers and customers.  Herold is deeply involved in each of these essential relationships.

Petitioner occupies a unique niche in the industry in terms of size.  Most of its competitors are either much smaller or much larger in terms of sales volume.  The smaller firms tend to have annual sales ranging from $5 to $15 million, and sales of the industry giants are in the billions of dollars.  Petitioner's sales were $35 to $45 million during the subject years.  To help petitioner thrive in this environment, Herold devised a strategy of identifying and aggressively pursuing large customers that

would not normally do business with a supplier as small as petitioner. As a result, petitioner sells to 10 of the top 20 accounts in the nation for its industry.

During petitioner's early days, Herold undertook major financial risks to provide funding for petitioner. When petitioner hit a slump in 1984, Herold withdrew funds from a qualified retirement plan, paying income tax on the withdrawal as well as a 10-percent penalty, to obtain funds needed to keep petitioner going. As part of the three-pronged strategy described above, Herold aggressively sought a relationship with Houston Instruments, seeking to market its Computer Aided Design (CAD) product line. To cement that relationship and meet Houston Instrument's concerns as to petitioner's financial stability, Herold mortgaged his house to secure a $75,000 letter of credit. Herold has also lent substantial personal funds to petitioner and personally guaranteed credit lines of $4 to $5 million with Sony Corp. and Mitsubishi Corp. These guaranties were still in effect during the subject years.

By contrast with his willingness to place his personal assets at risk, Herold maintains a conservative financial strategy with respect to petitioner. He insists that petitioner maintain substantial cash reserves, refusing his financial adviser's suggestions that petitioner "play the float". This builds petitioner's credibility with suppliers and customers and enables it to take full advantage of vendors' early payment discounts. By following this strategy, petitioner has incurred

interest costs of $100,000 to maintain its cash balances in some years, while generating savings of as much as $250,000 through early payment discounts.

    3.  Petitioner's Operations, Financial Results, and Dividend History

    For 1985, 1992, and 1993, petitioner's gross receipts (net of returns and allowances), gross income, book net income (before deducting Herold's compensation), taxable income (before deducting Herold's compensation), Herold's compensation, and Herold's compensation percentages (rounded to the nearest dollar) were:[1]

| Taxable Year | Gross Receipts (Net of Returns) | Gross Income | Book Net Income | Taxable Income | Herold's Compensation |
|---|---|---|---|---|---|
| 1985 | $826,544 | $660,564 | $135,565 | $135,565 | $120,000 |
| 1992 | 37,162,286 | 4,336,752 | 1,296,512 | 1,356,628 | 1,200,000 |
| 1993 | 45,558,284 | 4,136,946 | 1,293,421 | 1,329,273 | 1,200,000 |

### Herold's Compensation Percentages

Herold's Compensation Divided by:

| Taxable Year | Gross Receipts (Net) | Gross Income | Net Income Per Books | Taxable Net Income |
|---|---|---|---|---|
| 1985 | 14.52% | 18.17% | 88.51% | 88.38% |
| 1992 | 3.23 | 27.67 | 92.55 | 88.45 |
| 1993 | 2.63 | 29.00 | 92.77 | 90.27 |

---

[1]We use 1985 as the base year for comparison purposes.  That was the year immediately after Herold became petitioner's sole shareholder.  At that point, petitioner had lost its sales representation arrangement with Apple, was facing the impending insolvency of the three major Apple accounts it had been cultivating, and was starting over again essentially from scratch.

Petitioner's retained earnings and the percentage by which those retained earnings increased over the previous year's amounts for 1985, 1992, and 1993 were:

| Year | Retained Earnings | Percent Increase |
|------|-------------------|------------------|
| 1985 | $141,939          | 9.2%             |
| 1992 | 504,507           | 23.7             |
| 1993 | 597,928           | 18.5             |

As of the end of these 3 years, petitioner reported the following total assets, liabilities, and equity:

| Year | Total Assets | Total Liabilities | Equity   |
|------|--------------|-------------------|----------|
| 1985 | $617,630     | $524,691          | $92,939  |
| 1992 | 8,097,928    | 7,592,421         | 505,507  |
| 1993 | 7,560,778    | 6,961,850         | 598,928  |

Petitioner's after-tax income (after deducting Herold's compensation), equity, and return on equity for 1985, 1992, and 1993 were:

| Year | Income   | Equity   | Return on Equity |
|------|----------|----------|------------------|
| 1985 | $15,565  | $92,939  | 16.75%           |
| 1992 | 96,512   | 505,507  | 19.09            |
| 1993 | 93,421   | 598,928  | 15.60            |

Petitioner has never paid any dividends.

## 4. Herold's Compensation From Petitioner

Herold has no written employment contract with petitioner. Herold does have a written bonus plan (as explained below).  In

1984 through 1993, petitioner paid Herold salary and bonuses as follows:

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 1984 | $262,000 | $120,000 | $382,000 |
| 1985 | 120,000 | - 0 - | 120,000 |
| 1986 | 120,000 | - 0 - | 120,000 |
| 1987 | 120,000 | - 0 - | 120,000 |
| 1988 | 170,000 | 400,000 | 570,000 |
| 1989 | 237,000 | 400,000 | 637,000 |
| 1990 | 397,500 | 400,000 | 797,000 |
| 1991 | 592,500 | 100,000 | 692,500 |
| 1992 | 600,000 | 600,000 | 1,200,000 |
| 1993 | 600,000 | 600,000 | 1,200,000 |

Petitioner also provided Herold with a $15,000 life insurance policy, health insurance, and vacation and sick leave during the subject years. Neither Herold nor any other employee of petitioner received contributions to a qualified pension or profit-sharing plan during the subject years.

Herold is the sole member of petitioner's board of directors, and, in that capacity, he devised formulas under which his bonus was paid. His practice each year was to prepare a "bottom-up" analysis of projected sales, revenues, and profits and then to determine sales goals, taking extraordinary events and economic conditions into account. His aim was to determine goals that were attainable with hard work. He then built a "stretch" factor into his goals in order to challenge himself. The resulting bonus plan was always keyed to specific sales increase percentages. Petitioner adopted each year's plan through board minutes drafted during the first week of April.

In establishing his compensation, Herold focused on some executives he knew personally and on some he knew by reputation, measuring himself against his personal competitors, executives at other companies, with whom he sought to achieve parity. He did not find directly comparable companies or make a statistically rigorous analysis. He looked at firms in related fields and came up with a figure that he considered an appropriate level to aspire to for himself. In 1992 and 1993, he considered $1.2 million the salary target compared to the executives he measured himself against. He set this figure as his maximum compensation in both years. He did not contemplate any increase in compensation between 1992 and 1993 although he aimed for and achieved substantial sales growth in that period.

Herold's bonus plans for 1988 through 1993 provided as follows:

| Sales Increase[1] | | | Bonus Amounts | | | |
|---|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 |
| 0 - 14% | - 0 - | - 0 - | $100,000 | - 0 - | - 0 - | $200,000 |
| 15 - 19 | - 0 - | - 0 - | same | - 0 - | $200,000 | 400,000 |
| 20 - 24 | $100,000 | $100,000 | 200,000 | $100,000 | 400,000 | 600,000 |
| 25 - 29 | same | same | same | same | 600,000 | same |
| 30 - 39 | same | same | 300,000 | same | same | same |
| 40 - 49 | 200,000 | 200,000 | 400,000 | 200,000 | same | same |
| 50 - 59 | same | same | same | same | same | same |
| 60 - 69 | 300,000 | 300,000 | same | 300,000 | same | same |
| 70 - 79 | same | same | same | same | same | same |
| 80 + | 400,000 | 400,000 | same | 400,000 | same | same |

[1]For the years 1988 through 1991, Herold's bonus was based on increases in all of petitioner's revenues from its distribution and sales representative activities. Beginning in 1992, only sales in petitioner's distribution business under the trade name GTI were taken into account.

Herold failed to achieve his maximum bonus percentage during 2 of these years. The 1989 target was approximately $14 million

for a maximum bonus of $400,000. Petitioner paid Herold the maximum bonus at a time when it appeared this target was met. Later that year, merchandise returns reduced 1989 sales to $13,265,000. At that level of sales, Herold was entitled to a 1989 bonus of $300,000 rather than $400,000. Herold never reimbursed petitioner for the $100,000 excess bonus he had received. In 1991, petitioner's sales volume increase was less than the maximum targeted amount. Petitioner paid Herold a bonus of just $100,000 rather than the $400,000 bonus he would have received if sales had increased 80 percent or more.

## 5. Petitioner's Employees

For 1989 through 1993, petitioners' five most highly compensated employees, their respective positions, their respective total bonuses for the year, and their respective total compensation for the year were as follows:

### 1989

| Employee | Position | Bonus | Total Compensation |
|----------|----------|-------|--------------------|
| Stephan Herold | President/CEO | $427,000 | $637,000 |
| Greg Harris | Vice president & account executive | 25,000 | 123,174 |
| Greg Appelhoff | Account executive | 5,000 | 103,409 |
| Dana Frederickson | Account executive | 2,500 | 83,042 |
| Joe Berini | Account executive | 1,000 | 69,835 |

### 1990

| Employee | Position | Bonus | Total Compensation |
|----------|----------|-------|--------------------|
| Stephan Herold | President/CEO | $430,000 | $797,500 |
| Dana Frederickson | Account executive | 3,000 | 144,769 |
| Greg Harris | Vice president & account executive | 30,000 | 140,930 |
| Greg Appelhoff | Account executive | – 0 – | 99,077 |
| Scott Munson | Account executive | – 0 – | 67,313 |

## 1991

| Employee | Position | Bonus | Total Compensation |
|----------|----------|-------|--------------------|
| Stephan Herold | President/CEO | $100,000 | $692,500 |
| Dana Frederickson | Account executive | 5,000 | 190,251 |
| Greg Appelhoff | Account executive | 25,000 | 186,996 |
| Greg Harris | Vice president & account executive | 12,500 | 97,703 |
| Wayne Williams | Account executive | 2,000 | 68,360 |

## 1992

| Employee | Position | Bonus | Total Compensation |
|----------|----------|-------|--------------------|
| Stephan Herold | President/CEO | $600,000 | $1,200,000 |
| Dana Frederickson | Account executive | - 0 - | 221,035 |
| Greg Appelhoff | Account executive | 20,000 | 182,710 |
| Jeff Fetzer | Account executive | - 0 - | 105,674 |
| Greg Harris | Vice president & account executive | - 0 - | 78,347 |

## 1993

| Employee | Position | Bonus | Total Compensation |
|----------|----------|-------|--------------------|
| Stephan Herold | President/CEO | $600,000 | $1,200,000 |
| Greg Appelhoff | Vice president & account executive | 50,000 | 254,200 |
| Chris Schmidt | Account executive | 2,000 | 92,303 |
| Bruce Senst | Controller | 10,000 | 89,583 |
| Curtis Ocepak | Account executive | 4,000 | 85,220 |

The total compensation of petitioner's four most highly compensated employees, other than Herold, for each of the years 1989 through 1993 as a percentage of Herold's compensation was as follows:

| | | Next Four Most Highly Compensated Employees | |
|------|----------------------|--------------------|---------------------|
| Year | Herold's Compensation | Total Compensation | As % of Herold's Compensation |
| 1989 | $637,000 | $379,460 | 59.57 |
| 1990 | 797,500 | 452,089 | 56.69 |
| 1991 | 692,500 | 543,310 | 78.46 |
| 1992 | 1,200,000 | 587,766 | 48.98 |
| 1993 | 1,200,000 | 521,306 | 43.44 |

During 1989 through 1993, petitioner's account executives earned both a salary and commissions. The bulk of their compensation each year was earned as commissions. Most account executives were paid a salary of $600 per month, although some received a higher salary. The account executives earned a commission of 25 percent of the gross margin on sales they generated. The commission paid by petitioner was a quarter to a third higher than generally paid in the industry.

Petitioner employed "consultative" selling techniques designed by Herold to differentiate itself in the marketplace and to justify higher-than-average markups. This strategy required that petitioner's account executives provide services beyond those normally provided in the industry. Petitioner's account executives spent more time with each customer than required of the competitors' account executives. Herold believed that this justified a more generous commission structure. Beyond that, Herold felt it was worthwhile to pay higher compensation to attract and retain the best people.

OPINION

We are faced with perhaps one of the most litigated issues in Federal income taxation, the deductibility of compensation paid to shareholder/employees of a closely held corporation. In order for employee compensation to be deductible by an accrual method taxpayer like petitioner, the compensation must be: (1) Incurred in the taxable year for services rendered to the taxpayer in the conduct of its trade or business, (2) reasonable

in amount, and (3) ordinary and necessary in character.  Sec.
162(a)(1); sec. 1.162-7(a), Income Tax Regs.  While each
criterion may be at issue from time to time, it is the
reasonableness standard that presents the most difficult issue.
As the Court has observed:

> Inherently, there is a natural tension between:
> (1) Shareholders/employees who feel that they are entitled
> to be paid from a corporation's profits, even to the
> exhaustion thereof, of an amount that reflects their
> skills and efforts, and (2) a provision in the tax law
> that conditions the deductibility of compensation on the
> concept of reasonableness.  What is reasonable to the
> entrepreneur/employee often may not be to the tax
> collector. * * * The term "reasonable", however, must
> reflect the intrinsic value of employees in the broadest
> and most comprehensive sense.  [Mad Auto Wrecking, Inc. v.
> Commissioner, T.C. Memo. 1995-153.]

The parties do not dispute that Herold's compensation was an
ordinary and necessary expense of petitioner or that it was paid
for services which he rendered to petitioner.  Thus, we assume it
was and limit our discussion to the question of reasonableness.

The reasonableness of compensation is a question of fact
that must be answered by comparing each employee's compensation
with the value of services that he or she performed in return.
RTS Inv. Corp. v. Commissioner, 877 F.2d 647, 650 (8th Cir.
1989), affg. per curiam T.C. Memo. 1987-98; Charles Schneider &
Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg.
T.C. Memo. 1973-130; Estate of Wallace v. Commissioner, 95 T.C.
525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).  The
Commissioner's determination as to the reasonableness of
compensation is presumed correct, and taxpayers like petitioner

must prove it wrong. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>RTS Inv. Corp. v. Commissioner</u>, <u>supra</u> at 650. Factors to consider in passing on the question of reasonableness, no one factor of which is controlling in itself, include: (1) The employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the employer's business; (4) a comparison of salaries paid with the employer's gross and net income; (5) the prevailing general economic conditions; (6) a comparison of salaries with distributions to officers and retained earnings; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the employer as to all employees; (9) the amount of compensation paid to the particular employee in previous years; (10) the employer's financial condition; (11) whether the employer and the employee dealt at arm's length; (12) whether the employee guaranteed the employer's debt; (13) whether the employer offered a pension plan or profit-sharing plan to its employees; and (14) whether the employee was reimbursed by the employer for business expenses that the employee paid personally. See <u>Rutter v. Commissioner</u>, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; <u>Charles Schneider & Co. v. Commissioner</u>, <u>supra</u> at 151-152; <u>Estate of Wallace v. Commissioner</u>, <u>supra</u> at 553; <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1155-1156 (1980); see also <u>Mad Auto Wrecking, Inc. v. Commissioner</u>, <u>supra</u>.

We carefully scrutinize the facts at hand because petitioner, the paying corporation, is controlled by Herold, the employee to whom the compensation was paid. We must be sure that any amount purportedly paid as compensation was actually paid for services rendered by Herold, rather than a distribution to him of earnings that petitioner could not otherwise deduct. RTS Inv. Corp. v. Commissioner, supra at 650; Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; Charles Schneider & Co. v. Commissioner, supra at 152-153. We turn to the applicable factors.

1. Employee's Qualifications

An employee's superior qualifications justify high compensation. See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972).

Herold is exceptionally qualified for petitioner's business by virtue of his education, training, experience, and dedication. He understands and controls every aspect of its operations. He is highly motivated and extremely productive. He is the primary reason for petitioner's success.

The ability to conceptualize a vision and to lead an organization to fulfill that vision is the essence of effective business leadership. As the record amply demonstrates, Herold's vision and insight into his industry have enabled him to invent and reinvent petitioner's business in response to a series of crises that might have led others to capitulate. In each

instance, petitioner has survived the crisis by dint of Herold's efforts. Petitioner's profitability, which rests upon its sales, upon key relationships Herold has painstakingly cultivated, and upon Herold's ambition, inventiveness, and energy (as opposed to petitioner's investment in capital) are the primary reasons for petitioner's sales, growth, and success. See Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, supra at 352-353.

## 2. Nature, Extent, and Scope of Employee's Work

An employee's position, hours worked, duties performed, and general importance to the success of a business may justify high compensation. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158.

Herold is a micromanager who oversees all of petitioner's executive and managerial functions. He performs or oversees virtually all of its sales activities. He supervises its daily operations, including supervising and directing its employees, and makes every key business decision. Given the vital role Herold plays in petitioner's operations and success, and the long hours that he dedicates thereto, we view Herold as indispensable to petitioner's business. Petitioner's growth and prosperity are due directly to his skills, dedication, and creativity. See Kennedy v. Commissioner, 671 F.2d 167, 176 (6th Cir. 1982), revg. 72 T.C. 793 (1979); Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, supra at 352-353.

3.  Size and Complexities of Employer's Business

Courts have considered the size and complexity of a taxpayer's business in deciding whether compensation is reasonable.  Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974).

Petitioner's is a highly specialized sales operation, occupying a unique niche in its industry.  There is no comparably sized competitor.  Most firms in the field are much smaller; a few are larger.  Herold's aggressive pursuit of large accounts that can be serviced at a lower cost relative to volume, and his development of a service-intensive, consultative selling style have enabled petitioner to compete successfully with its industry's giants and to develop relationships with 10 of the 20 largest national accounts in its field.

4.  Comparison of Salaries Paid With Net and Gross Income

A comparison of sales and net income to amounts of compensation may be important in deciding whether compensation is reasonable.  Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153.

The instant percentages are reasonable in light of Herold's qualifications and the nature, extent, scope, and success of his efforts.  In 1992, his salary was 3.23 percent of gross receipts and 27.67 percent of gross income.  In 1993, his salary was 2.63 percent of gross receipts and 29 percent of gross income.

His salary was 92.56 percent and 92.78 percent of book net income (before deducting his compensation), respectively.  His

salary was 88.45 percent of taxable net income (before deducting his compensation) in 1992 and 90.27 percent in 1993.

5. General Economic Conditions

This factor helps to determine whether the success of a business is attributable to general economic conditions, as opposed to the efforts and business acumen of the employee. General economic conditions may affect a business' performance and indicate the extent (if any) of the employee's effect on the company. Adverse economic conditions, for example, may tend to show that an employee's skill was important to a company that grew during the bad years. Mad Auto Wrecking, Inc. v. Commissioner, supra.

Petitioner has faced economic ruin and been forced to reinvent itself on at least three separate occasions. Its sales went from $1 million in its first year to $70 million in 1984. Sales fell to less than $1 million in 1985 and were back up to nearly $44 million by 1993.

In 1984, petitioner lost its sales representation contract with Apple. This accounts for the precipitous sales decline in 1985. While petitioner represented Apple, it had developed Apple's four largest accounts nationwide. Herold devised a strategy of targeting these four largest accounts and selling other electronics products to them. He succeeded with three of these jumbo accounts. Just as that strategy was beginning to take hold, all three of these accounts ran into adverse economic conditions and became insolvent. Again, petitioner saw its

continuing viability threatened, and, again, Herold devised a new strategy:  a three-pronged, targeted focus on key products in each of three different phases of market penetration.  Combined with the consultative selling technique Herold had crafted and his focus on selling to very large customers who would not normally do business with a company the size of petitioner, Herold succeeded in reinventing and revitalizing petitioner's business each time it was threatened.

6.  Comparison of Salaries With Distributions to Officers and Retained Earnings

The failure to pay more than minimal dividends may suggest that reported compensation actually is (in whole or in part) a dividend.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Charles Schneider & Co. v. Commissioner, 500 F.2d at 151. Corporations, however, are not required to pay dividends. Shareholders may be equally content with the appreciation of their stock caused, for example, by the retention of earnings. Owensby & Kritikos, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162; see also Rev. Rul. 79-8, 1979-1 C.B. 92 (compensation is not unreasonable merely because a corporation pays an insubstantial portion of its earnings as dividends).  In reviewing the reasonableness of an employee's compensation, a hypothetical independent investor standard may be used to determine whether a shareholder has received a fair return on investment after the payment of the

compensation in question.  See <u>Owensby & Kritikos, Inc. v.</u>
<u>Commissioner</u>, <u>supra</u> at 1326-1327; <u>Medina v. Commissioner</u>, T.C.
Memo. 1983-253.

Whether to pay a dividend, and the amount thereof, were
business decisions Herold made acting as petitioner's sole
director.  Herold treated his company, in effect, as a "growth
stock", reinvesting earnings and aiming to derive a return on his
investment in the form of capital gain at some future time by
selling his shares in the company.  At the time of trial, a
potential buyer had offered $25 million for Herold's stake in
petitioner.

We refuse to second-guess the business judgment of
petitioner's director under the facts herein; we view its
decision not to pay dividends as a reasonable business decision.[2]
See <u>Comtec Sys., Inc. v. Commissioner</u>, T.C. Memo. 1995-4.  In
addition to the fact that the increase in petitioner's retained
earnings most likely increased the value of its stock, we believe
that a hypothetical investor would have considered over $450,000
growth in retained earnings to have been an acceptable
performance for the period from 1985 to 1993.  A growth-oriented
investor might be most concerned with the increases in annual

---

[2] As noted above, petitioner's strategy is to maintain
substantial cash balances to take advantage of early payment
discounts and to present a reassuring image of financial
stability for the large customers with whom petitioner seeks to
do business.  By building retained earnings to more than a half
million dollars, petitioner reduces the interest costs it would
otherwise incur to maintain these cash balances.

revenue, which a potential buyer would focus on in formulating an offering price for petitioner's stock. The $25 million offer that has been made would certainly tend to validate such a judgment. We conclude that an investment in petitioner's stock was very attractive and that a hypothetical investor would have received a handsome return through appreciation in the value of petitioner's stock.

7.  Prevailing Rates of Compensation for Comparable
Positions in Comparable Concerns

Petitioner and respondent rely on expert testimony with respect to this factor. We have wide discretion when it comes to expert testimony. Sometimes, an expert will help us decide a case. See, e.g., Booth v. Commissioner, 108 T.C. 524, 573 (1997); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C. Ltd. v. Commissioner, T.C. Memo. 1997-96. Other times, he or she will not. See, e.g., Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). We weigh an expert's testimony in light of his or her qualifications, and with proper regard to all other credible evidence in the record. We may accept or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion which we adopt. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Parker v.

Commissioner, 86 T.C. 547, 562 (1986); see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.

We are not persuaded by either expert. Petitioner's expert was Edwin S. Mruk, senior partner and owner of Mruk & Partners. He candidly stated that the companies he had used for comparison were "reasonably comparable, not totally comparable." He chose these companies not because they were appropriate, but because they were cited in an engineering report respondent used in making his determination in this matter. Respondent's engineering report was not offered in evidence. Mr. Mruk also did not make an independent evaluation, preparing a rebuttal for a document that is not part of the record.

Respondent's expert was James Carey, owner of a management consulting firm, Carey Associates, Inc. His conclusions were not based on data from businesses that are akin to the business at hand; i.e., medium-sized wholesalers of electronic components. Some of the firms in his survey are, for example, software designers, rather than hardware distributors. Others are large, publicly traded corporations with sales far in excess of petitioner's. We also question the reliability and validity of Mr. Carey's sample size and data analysis. He received replies from only 40 out of nearly 1,200 persons to whom he directed his mailing, and he pointed to no methodological guidelines that would indicate this small number was statistically reliable. In fact, on many occasions, persons failed to answer questions, and Mr. Carey interpreted these omissions as negative responses.

Nothing in the record gives us comfort that treating blank responses as negative responses is a reasonable approach under the circumstances. Once again, "'We are not satisfied that a reasonable level of compensation for an executive like * * * [Herold] can be accurately determined by reference to the industries * * * [Mr. Carey] surveyed because of the absence of significant information on other businesses similar to petitioner's.'" Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129 (quoting Thomas A. Curtis, M.D., Inc. v. Commissioner, T.C. Memo. 1994-15); see also Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153. Indeed, comparing compensation paid to officers of companies that differ markedly provides guidance of dubious value. See Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84; Niagara Falls Coach Lines, Inc. v. Commissioner, T.C. Memo. 1977-269.

8.  Employer's Salary Policy As to All Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159. We look to this factor to determine whether Herold was compensated differently than petitioner's other employees merely because of Herold's status as a shareholder. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323. A reasonable, longstanding, and consistently applied compensation plan is evidence that compensation is reasonable.

Petitioner's approach to compensation leaned heavily on commissions as a motivational tool for all of its employees. Its commission structure for all of its employees was considerably more generous than the industry standard. Herold's approach to determining his own compensation structure was consistent with that overall approach. We think it is significant that Herold consistently designed his compensation structure by the end of the first quarter each year and memorialized the bonus structure in board minutes. This was done well before Herold could know what the actual outcome for the year would be. With one minor deviation that we do not consider significant,[3] petitioner lived by this structure. When he failed to "make his numbers", he did not get his maximum bonus. He was never paid any additional bonus beyond the maximum he had committed petitioner to earlier in the year.

9. Compensation Paid in Previous Years

An employer may deduct compensation paid to an employee in a year although the employee performed the services in a prior year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); see also R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972),

---

[3] In 1 year, after-the-fact developments caused the maximum sales target to be missed by a relatively small amount. By then Herold had been paid the maximum bonus, which was appropriate according to the information available when the payment was made. As it later turned out, he was overpaid by $100,000. Looking at Herold's overall track record and the vital role he played in petitioner's continuing success, we do not believe independent investors would have pressed Herold to repay this overage. We note, for example, that Herold was not paid a bonus during petitioner's lean years.

and the cases cited therein. In order to do so, the employer must show: (1) That the employer intended to compensate the employee for past undercompensation and (2) the amount of the undercompensation. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. at 553-554.

The record does not indicate that Herold's compensation during the subject years was attributable to services which he performed for petitioner in earlier years. In fact, Herold even testified that none of his 1992 and 1993 compensation was redress for earlier years.

## 10. Employer's Past and Present Financial Condition

Petitioner grew and became very profitable under Herold's leadership. Its equity grew from $92,939 at the end of 1985 to $598,928 at the end of 1993, an increase of 644 percent.

## 11. Whether Employer and Employee Dealt at Arm's Length

Where an employer and an employee are not dealing at arm's length, the amount of compensation paid may be unreasonable. Owensby & Kritikos, Inc. v. Commissioner, supra at 1324; see Gilman Paper Co. v. Commissioner, 284 F.2d 697 (2d Cir. 1960), affg. T.C. Memo. 1960-13.

As petitioner's sole shareholder and its only board member, Herold controlled every detail of the process by which his compensation was determined. Nevertheless, we are impressed by the lengths Herold went to in order to develop objective underpinnings for his bonus formula each year.

12.  Whether Employee Guaranteed Employer's Debt

Courts have considered whether an employee personally guaranteed his or her employer's debt in determining whether the employee's compensation is reasonable.  In certain situations, an employee's personal guaranty of his or her employer's debt may entitle the employer to pay a greater salary to the employee than the employer would otherwise have paid.  See Owensby & Kritikos, Inc. v. Commissioner, supra at 1325 n.33; R.J. Nicoll Co. v. Commissioner, supra at 51; see also Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6; BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5.

At a key point, when petitioner's economic outlook was grim, Herold pledged his personal residence to secure a letter of credit that was required by a potential supplier, Houston Instruments.  Securing Houston Instruments as a supplier was a linchpin of Herold's three-pronged strategy.  In addition to the fact that Herold was willing to put his residence at risk to ensure this strategy's success, Herold also personally guaranteed other credit lines of $4 to $5 million, which were still in effect during the subject years.

13.  Absence of Pension Plan/Profit-Sharing Plan

Courts have considered the absence of a pension plan or a profit-sharing plan in determining reasonable compensation. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Kennedy v. Commissioner, 671 F.2d at 174-175.  Such an absence may allow the employer to pay the

employee more compensation than the employer would have paid had the employer offered the employee a pension plan or a profit-sharing plan.  Rutter v. Commissioner, supra at 1274.

Petitioner did not have a pension or profit-sharing plan. Thus, Herold did not receive the benefit of any qualified retirement plan contributions.

14.  Reimbursement of Business Expenses

Courts have considered the reimbursement of business expenses in determining reasonable compensation.  An employer may pay greater compensation to an employee to reflect the fact that the employee is not being reimbursed for expenses that he or she paid on behalf of the employer.  Id.

There is no evidence that Herold incurred unreimbursed expenses on behalf of petitioner.

Conclusion

Our analysis of the factors favors the deductibility of all the compensation paid to Herold by petitioner.  We sustain petitioner's deductions in 1992 and in 1993 as for reasonable compensation.

To reflect the foregoing,

Decision will be entered for petitioner.