T.C. Memo. 2013-84

UNITED STATES TAX COURT

K & K VETERINARY SUPPLY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9442-11.                    Filed March 25, 2013.

John P. Neihouse and Laurence M. McCredy, for petitioner.

Kirk Steven Chaberski and Ashley D. Money, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies of $499,267 and
$291,798 in petitioner's Federal income tax for taxable years ended May 31, 2006,
and May 31, 2007, respectively.  The issues for decision are:  (1) whether amounts
paid as compensation to officers and certain employees are reasonable within the

**[*2]** meaning of section 162(a)(1); (2) whether amounts paid as rental expenses to a related entity are reasonable within the meaning of section 162(a)(3); and (3) whether the doctrine of equitable recoupment applies.  Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  At the time the petition was filed, petitioner had its principal place of business in Arkansas.

Petitioner was incorporated in 1988 by John K. Lipsmeyer (J. Lipsmeyer) and Kelly Bright.  Petitioner was a wholesale distributor of animal health products for large animals, swine, sheep, goats, and horses; lawn and garden products; farm hardware; pet supplies; and products for farm stores and related dealers.  Petitioner sold roughly 17,000 to 19,000 different products and had between 550 and 600 vendors.

J. Lipsmeyer has worked for petitioner since its incorporation.  Petitioner bought Bright's stock in 2002, leaving J. Lipsmeyer as petitioner's sole shareholder at that time, and he remained petitioner's sole shareholder.  J.

**[*3]** Lipsmeyer was petitioner's president, co-chief executive officer, and co-chief operating officer; his wife, Melissa Lipsmeyer (M. Lipsmeyer) was petitioner's vice president, secretary, and assistant chief financial officer; his brother, David Lipsmeyer (D. Lipsmeyer), was petitioner's senior vice president of sales, and co-chief executive officer and co-chief operating officer with J. Lipsmeyer; and his daughter, Jennifer Stewart (Stewart), was petitioner's chief financial officer.

J. Lipsmeyer's duties were interacting with most of petitioner's vendors, negotiating terms and programs that vendors offer or that petitioner would like to have offered; pricing products; making personnel decisions, including hiring all of the people who work for petitioner and determining salary and bonus amounts; sales, including traveling approximately 7 out of 20 working days per month to sales calls and making sales calls to approximately 34 of petitioner's customers. The geographic area in which J. Lipsmeyer made sales calls included North Central Arkansas, Central Arkansas, Western Arkansas, Southern Missouri, and Eastern Oklahoma. J. Lipsmeyer, together with M. Lipsmeyer, was co-guarantor of petitioner's line of credit that amounted to approximately $3.3 million. Before forming petitioner, J. Lipsmeyer was employed by Bierwirth Veterinary Supply for 16.5 years to perform sales and warehouse work and drive a truck. He had a commercial driver's license while at Bierwirth, which he maintained.

**[*4]**   M. Lipsmeyer began working for petitioner in 1999 and had worked in accounts payable and accounts receivable.  She worked an average of 30 to 35 hours per week but would work more hours during busier times.  Before joining petitioner, she had worked in customer service and inventory control at Durvet Inc., an animal health company.

D. Lipsmeyer's duties were handling approximately 50 of petitioner's accounts; traveling approximately three weeks out of each month and between 700 and 900 miles per week; training the approximate 25-27 members of petitioner's sales force; and providing input to J. Lipsmeyer about hiring decisions and product pricing.  In addition to his sales responsibilities, D. Lipsmeyer was responsible for the two trade shows that petitioner hosted each year that included approximately 200 customers and between 100 and 120 vendors.  He worked between 60 and 65 hours per week.  He was involved in the formation of petitioner and has worked for petitioner since its incorporation in 1988.  He was not an original shareholder due to financial constraints.  Before working for petitioner he had worked for the same veterinary supply company as J. Lipsmeyer, taking and filling orders.

Stewart's duties since assuming her role as chief financial officer in 2002 were overseeing accounts payable and accounts receivable; meeting with

[*5] petitioner's accountant; meeting with petitioner's banking institutions; and serving as co-trustee of petitioner's section 401(k) plan. She also dealt with human resources and petitioner's various insurance plans, such as medical insurance; handled payroll for approximately 85-87 people; issued bonuses; and worked with several of petitioner's warehouses on OSHA compliance. She had 90 college credit hours in business finance. She had previously worked part time for petitioner beginning in 1988 for between 2 and 3 years and then worked full time for petitioner for 19 years.

Petitioner has had an employee handbook in place since 2002 or 2003, and a copy given to each employee stated that salary would be determined by petitioner's president. The handbook did not include a written bonus policy. Bonuses were based on how well petitioner was doing financially, employee job performance, and work ethic. Petitioner paid bonuses to some of its employees. Petitioner had a section 401(k) plan in place for employees. The plan has a mandatory 5% employer match, and petitioner's contributions to the plan have been at least 17% since 2002. Petitioner's section 401(k) plan contributions were 20.5% and 17.7% in 2006 and 2007, respectively.

During 2005, petitioner entered into an agreement (Lease No. 1) to lease the property in Arkansas (Business Property) from Lipspaces, LLC (Lipspaces). J.

**[*6]** Lipsmeyer and M. Lipsmeyer were the only members of Lipspaces. The term of Lease No. 1 began on March 1, 2005, and ended on February 29, 2008. At the time of Lease No. 1, the Business Property consisted of 87,897 square feet of warehouse space and office space. J. Lipsmeyer executed Lease No. 1 on behalf of Lipspaces as lessor and on behalf of petitioner as lessee. During 2007, following expansion of the Business Property warehouse space, petitioner and Lipspaces entered into a new agreement for the lease of the Business Property (Lease No. 2). The term of Lease No. 2 began on April 1, 2007, and ended on February 28, 2010. At the time of Lease No. 2, the Business Property consisted of 159,497 square feet of warehouse space and office space.

Petitioner was a subchapter C corporation and an accrual basis taxpayer for purposes of Federal income tax. Petitioner reported gross receipts/sales of $59,902,028; gross profit of $9,606,817; total income of $10,468,463; and taxable income of $128,545 on Form 1120, U.S. Corporation Income Tax Return, for 2006 (2006 Form 1120). Petitioner reported gross receipts/sales of $65,954,366; gross profit of $9,686,513; total income of $10,373,588; and taxable income of $41,948 on Form 1120 for 2007 (2007 Form 1120).

Petitioner paid a dividend to J. Lipsmeyer of $30,000 during each year in issue. Petitioner paid compensation to J. Lipsmeyer and M. Lipsmeyer as officers.

[*7] Petitioner paid compensation to D. Lipsmeyer and Stewart as employees. The portion of the deduction petitioner claimed as wages accrued to J. Lipsmeyer for 2007 is not in issue in this case. Petitioner claimed deductions for officer and employee compensation on the 2006 Form 1120 and the 2007 Form 1120 as follows:

|  | 2006 | 2007 |
|---|---|---|
| Officers: |  |  |
| J. Lipsmeyer | $981,728 | $746,229 |
| M. Lipsmeyer | 215,000 | 198,000 |
| Employees: |  |  |
| D. Lipsmeyer | 922,853 | 735,029 |
| Stewart | 287,528 | 287,429 |

Petitioner claimed deductions for the Business Property rent of $564,000 and $651,000 on the 2006 Form 1120 and 2007 Form 1120, respectively.

On April 21, 2011, respondent sent to petitioner a notice of deficiency disallowing (1) a portion of the deduction petitioner claimed for officer compensation related to J. Lipsmeyer and M. Lipsmeyer for 2006 of $363,017; (2) a portion of the deduction petitioner claimed for officer compensation related to M. Lipsmeyer for the year 2007 of $62,946; (3) a portion of the deduction petitioner claimed for salaries and wages related to D. Lipsmeyer and Stewart for the year 2006 of $835,788; (4) a portion of the deduction petitioner claimed for

**[\*8]** salaries and wages related to D. Lipsmeyer and Stewart for the year 2007 of $520,367; (5) a portion of the deduction petitioner claimed for rent of $242,000 for 2006; and (6) a portion of the deduction petitioner claimed for rent of $251,000 for 2007.

OPINION

Generally, the taxpayer has the burden of proving that the Commissioner's determination is in error. See Rule 142(a). However, the burden of proof may shift to the Commissioner under certain circumstances. See sec. 7491(a)(1). Both parties have presented evidence and introduced expert witness reports. We decide this case based on the preponderance of evidence. See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005) (where both parties have satisfied their burden of production, the party supported by the weight of the evidence will prevail regardless of which party had the burden of persuasion, proof, or preponderance), aff'g T.C. Memo. 2003-212.

Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). While we may accept an expert opinion

**[\*9]** in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion or reject the opinion in its entirety, Parker v. Commissioner, 86 T.C. at 561.  We decide, as the trier of fact, the weight afforded a witness's testimony.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); RTS Inv. Corp. v. Commissioner, T.C. Memo. 1987-98, aff'd, 877 F.2d 647 (8th Cir. 1989).

Reasonable Compensation

Section 162(a)(1) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered.  A taxpayer is entitled to a deduction for salaries or other compensation if the payments were reasonable in amount and are in fact payments purely for services.  Sec. 1.162-7(a), Income Tax Regs.

Whether the compensation paid by a corporate taxpayer to a shareholder-employee was reasonable is a question of fact.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323 (5th Cir. 1987), aff'g T.C. Memo. 1985-267; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), aff'g T.C. Memo. 1973-130.  Courts have considered various factors in assessing the reasonableness of compensation, such as:  employee qualifications; the nature,

[*10] extent, and scope of the employee's work; the size and complexity of the business; prevailing general economic conditions; the employee's compensation as a percentage of gross and net income; the employee shareholders' compensation compared with distributions to shareholders; the employee-shareholders' compensation compared with that paid to non-shareholder-employees; prevailing rates of compensation for comparable positions in comparable concerns; and comparison of compensation paid to a particular shareholder-employee in previous years where the corporation has a limited number of officers. Charles Schneider & Co. v. Commissioner, 500 F.2d at 151-152. No single factor is dispositive. See Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 178 (10th Cir. 1975), aff'g 61 T.C. 564 (1974). Special scrutiny is given in situations where a corporation is controlled by the employees to whom the compensation is paid because there is a lack of arm's-length bargaining. Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d 193, 194 (8th Cir. 1952).

Petitioner contends the compensation petitioner paid to J. Lipsmeyer, M. Lipsmeyer, D. Lipsmeyer, and Stewart during each of the years in issue was reasonable. Respondent argues that petitioner failed to show that any compensation paid to J. Lipsmeyer, M. Lipsmeyer, D. Lipsmeyer, and Stewart in

[*11] excess of the amounts respondent allowed constitutes reasonable compensation and, therefore, it is not deductible under section 162(a)(1).

1.  Employee Qualifications

An employee's superior qualifications for his or her position with the business may justify high compensation.  See Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 121 (6th Cir. 1949); Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1158 (1980).

J. Lipsmeyer and D. Lipsmeyer were highly qualified for their respective positions.  J. Lipsmeyer was one of petitioner's two initial shareholders and has worked for petitioner since its incorporation.  Although D. Lipsmeyer was not a shareholder, he, too, was involved in petitioner's formation and had worked for petitioner since its incorporation in 1988.  J. Lipsmeyer and D. Lipsmeyer also had prior experience working for a veterinary supply company that is relevant to petitioner's business.

Although Stewart had worked part time for petitioner for approximately 3 years and then worked full time for petitioner for 19 years, the record does not establish the nature of her duties or responsibilities before 2002 when she assumed the title of chief financial officer.  Nonetheless, the duration of her employment

[*12] with petitioner demonstrates experience with certain aspects of petitioner's operations, and her business finance college credit hours are related to her duties as chief financial officer.

M. Lipsmeyer's prior experience in customer relations and inventory with an animal health company was relevant to petitioner's business.  She testified that she had worked for petitioner since 1999 and that her work focused on accounts payable and accounts receivable, which demonstrates familiarity with these aspects of petitioner's business.  However, the evidence does not establish that M. Lipsmeyer's experience rises to the level of superior qualification for her positions as vice president, secretary, and assistant chief financial officer.

2.  Nature, Extent and Scope of Employee's Work

An employee's position, duties performed, hours worked, and general importance to the corporation's success may justify high compensation.  See Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1158.

The evidence supports J. Lipsmeyer's and D. Lipsmeyer's importance to petitioner's success.  J. Lipsmeyer interacted with vendors, priced products, made personnel decisions, and was actively involved in sales, including traveling 7 out of 20 working days per month to make sales calls to 34 of petitioner's customers.

**[*13]** The record supports his testimony that as president, co-chief executive officer, and co-chief operating officer, the "bottom line stops with me". D. Lipsmeyer has worked for petitioner since its incorporation in 1988. He was co-chief executive officer and co-chief operating officer with J. Lipsmeyer in addition to serving as petitioner's senior vice president of sales. He worked 60-65 hours per week and traveled approximately three weeks each month. He not only trained approximately 25-27 members of petitioner's sales force but also handled approximately 50 of petitioner's different accounts and was also responsible for petitioner's two trade shows each year.

As chief financial officer, Stewart performed a range of duties related to petitioner's financial matters. She was also involved in administrative matters, such as petitioner's various insurance programs and OSHA compliance. Although her tenure as chief financial officer had been relatively brief, her duties in that role, taken together with her administrative duties and her years of experience previously working for petitioner demonstrate her general importance to petitioner's success.

Although M. Lipsmeyer held the titles of vice president, secretary, and assistant chief financial officer, she testified that

**[\*14]** [i]t's very hard for me to say what exactly I was doing other than the obvious, which was helping with, you know, like the financial decisions. \* \* \* Well, just have conversations naturally with my husband about, you know, what was going on with the business as far as were there any--you know, where monies were going or anything that was upcoming as far as needs of the company, just in general finances.

Her vague description of her own duties taken together with her 30-35 hour average work week, which at busier times included an unspecified number of additional hours, are incongruous with her position titles in companies in which family relationships do not exist.

    3.  Size and Complexity of the Business

    Courts consider the size and complexity of a taxpayer's business when deciding the reasonableness of compensation paid to its shareholder-employees. See Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; RTS Inv. Corp. v. Commissioner, T.C. Memo. 1987-98.  We have considered a company's sales, net income, gross receipts, or capital value in determining a company's size, Miller & Sons Drywall, Inc. v. Commissioner, T.C. Memo. 2005-114; see Beiner, Inc. v. Commissioner, T.C. Memo. 2004-219; Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160, as well as the number of clients, and the number of employees; growth in these areas; and compliance with government regulations.

[*15] See Alpha Med., Inc. v. Commissioner, T.C. Memo. 1997-464, rev'd on other grounds 172 F.3d 942 (6th Cir. 1999).

Petitioner's reported gross sales/receipts of $59,902,028 and $65,954,366, respectively, for 2006 and 2007, respectively, and gross profit of approximately $9,600,000 for each of these years indicate that petitioner is a substantial business. There is no evidence of petitioner's capital value.

J. Lipsmeyer's testimony that petitioner held licenses to transport certain hazardous materials and to sell certain products indicates compliance with government regulations. However, the record does not establish that petitioner held any or all of these licenses during the years in issue. The number of petitioner's different products, the number of vendors, and the number of employees demonstrate a degree of complexity. Although approximately 200 of petitioner's customers attended the trade shows, there is no other evidence as to the number of customers to which petitioner sold any products or the extent to which petitioner's customer base expanded. On this record, there is insufficient evidence to conclude that the size and complexities of petitioner's business warrant high compensation.

**[\*16]** 4.  <u>General Economic Conditions</u>

General economic conditions may affect a company's performance and thus show the extent of the employee's effect on the company.  <u>See</u> <u>Rutter v. Commissioner</u>, 853 F.2d 1267 (5th Cir. 1988), <u>aff'g</u> T.C. Memo. 1986-407; <u>Mayson Mfg. Co. v. Commissioner</u>, 178 F.2d at 119-120.  Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during the bad years.  <u>Alpha Med., Inc. v. Commissioner</u>, 172 F.3d 942.  There is insufficient evidence to conclude that general economic conditions affected petitioner's performance.

5.  <u>Comparison of Salaries Paid With Gross and Net Income</u>

Compensation as a percentage of a taxpayer's gross and net income has been considered in deciding whether compensation is reasonable.  <u>See</u> <u>RTS Inv. Corp. v. Commissioner</u>, T.C. Memo. 1987-98.  In most cases the comparison of salaries to net income is more probative.  <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1325.

Petitioner reported gross receipts of $59,902,028 and net income before taxes of $128,454 on the 2006 Form 1120.  The aggregate amount petitioner deducted as compensation for J. Lipsmeyer, M. Lipsmeyer, D. Lipsmeyer, and

[*17] Stewart in 2006, $2,407,109, is more than 100% of petitioner's reported net income before taxes and is 4% of the reported gross receipts.

Petitioner reported gross receipts of $65,954,366 and net income before taxes of $41,948 on the 2007 Form 1120. The aggregate amount of compensation petitioner paid and deducted for M. Lipsmeyer, D. Lipsmeyer, and Stewart in 2007, $1,022,458, is more than 100% of the reported net income before taxes and is 2% of the reported gross receipts. Petitioner argues that net income is appropriately calculated as net income before taxes and before deducting employee compensation and, as a result, the aggregate compensation petitioner paid was 95% of net income in 2006 and 97% of net income in 2007.

High percentages may be reasonable in certain circumstances. See Pulsar Components Int'l, Inc. v. Commissioner, T.C. Memo. 1996-129 (officers were exceptionally qualified by virtue of education, training, experience, and dedication and had been undercompensated in prior years); Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153 (primary reasons for corporation's growth and success were shareholders' training, experience, and dedication); Acme Constr. Co., Inc. v. Commissioner, T.C. Memo. 1995-6 (chief executive officer's services caused corporation's success); see also Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38 (evidence that profits are attributable to

**[*18]** compensated officers is required), aff'd, 326 F.3d 1 (1st Cir. 2003). Although

J. Lipsmeyer and D. Lipsmeyer had significant experience in petitioner's operations

and were important to petitioner's success, the record does not establish that J.

Lipsmeyer or D. Lipsmeyer was exceptionally qualified or that either was the

primary reason for petitioner's growth. The record supports Stewart's general

importance to petitioner's success, but falls short of establishing that she was

exceptionally qualified or the primary reason for petitioner's growth. The record

falls far short of establishing that M. Lipsmeyer was exceptionally qualified or was

the primary reason for petitioner's growth.

6. Prevailing Rates of Compensation

A comparison of the compensation under consideration and the prevailing

rates of compensation paid to those in similar positions in comparable companies

within the same industry is a most significant factor. Charles Schneider & Co. v.

Commissioner, 500 F.2d at 154.

The parties rely on expert reports and testimony with respect to this factor.

Petitioner's expert is Jason M. Thomas. At the time of trial, Thomas was a senior

tax manager with Frost, PLLC; a CPA and an attorney. His reasonable

compensation experience included providing litigation support services in

commercial litigation cases, dissenting shareholder rights and marital dissolution

[*19] cases; tax compliance services; and financial advisory services. Respondent's expert is Martin Wertlieb. At the time of trial, Wertlieb headed his own compensation consulting firm of Martin Wertlieb Associates and had not only provided executive compensation counsel to numerous clients in a range of activities in both the public and private sectors, but had also qualified as an expert witness on executive compensation before Congress and various courts, including this Court.

Thomas' report provides guidance of dubious value because he failed to identify comparable companies, see, e.g., Mad Auto Wrecking, Inc., v. Commissioner, T.C. Memo. 1995-153; RTS Inv. Corp. v. Commissioner, T.C. Memo. 1987-98; and we accord it little weight. First, he failed to identify companies within an industry comparable to petitioner. The companies in his sample related to the Southeastern United States and were drawn from SIC Division F category (wholesale dealers of both durable and nondurable goods). Although Thomas was aware at the time he prepared his report that petitioner dealt with only nondurable goods, he failed to narrow his search and merely opined that the broad SIC Division F industry category was the most applicable. His remaining sample included companies that were headquartered in Northwest Arkansas and failed to reflect any industry category whatsoever.

**[\*20]** Second, Thomas failed to establish that the companies in either of his samples were of a size comparable to petitioner. Although his report purports to be based on "gross profit percentage", which he defined to mean "the difference between gross revenue and the cost of producing a product or providing a service", he testified that "[n]ever was a gross profit percentage a criteria in order to select the companies" in either of his samples. Instead, he selected the companies in both of his samples based on the amount of compensation paid to four categories of executives and then assigned the companies to one of three percentiles (25th, 50th, and 75th) based exclusively on the amount of compensation those companies paid to the executives. He provided no data as to how many companies were included in either of his two samples or the identity of any company; no relevant financial data, such as gross receipts or sales, net income, or capital value, see Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160; and no financial analysis.

In contrast, Wertlieb identified 12 publicly listed companies engaged in the nondurable goods wholesale industry related to chemicals and distributing farming equipment and supplies (Benchmark Companies) based on financial reports and proxy statements filed with the Securities and Exchange Commission for each of the years in issue. He presented financial data for each of the Benchmark

[*21] Companies, including the amount of annual revenues, amount of pretax profits, pretax profits as a percentage of annual revenues, and amount of compensation paid to the top two executives and the chief financial officer. Although all of the Benchmark Companies are publicly traded and their size ranged from smaller to larger than petitioner based on gross revenues, we do not think his industry category is overly broad or otherwise defeats our purpose here and, in any event, his categorization was the most persuasive of the industry categorizations on this record. See, e.g., RTS Inv. Corp. v. Commissioner, T.C. Memo. 1987-98.

Wertlieb determined the amounts of reasonable compensation based on the correlation between the Benchmark Companies' annual sales/revenues and fixed compensation as demonstrated by application of the linear regression statistical technique. He determined that fixed compensation at his correlation's 90th percentile was reasonable for J. Lipsmeyer and D. Lipsmeyer after also taking into account their respective duties and responsibilities and their experience. He then allocated the compensation amount he had determined to J. Lipsmeyer and D. Lipsmeyer in proportion to the actual base salaries paid to each of them during the years in issue. Using the same approach, he determined that fixed compensation at the correlation's 75th percentile was reasonable for Stewart after also taking into

[*22] account her duties and responsibilities and her relatively brief tenure as petitioner's chief financial officer. He did not determine a correlation percentile for M. Lipsmeyer's fixed compensation. Instead, he determined that M. Lipsmeyer's reasonable compensation was 73% of Stewart's compensation at the 75th percentile, which was the same proportion of M. Lipsmeyer's actual base compensation to Stewart's actual base compensation in each of the years in issue. Based on his data, methodology, and analysis, Wertlieb determined that the following amounts represented reasonable compensation to J. Lipsmeyer, M. Lipsmeyer, D. Lipsmeyer, and Stewart for each of the years in issue:

|  | 2006 | 2007 |
|---|---|---|
| Officers: | | |
| J. Lipsmeyer | $732,300 | $559,100 |
| M. Lipsmeyer | 134,400 | 133,500 |
| Total | 866,700 | 692,600 |
| Employees: | | |
| D. Lipsmeyer | 590,500 | 470,000 |
| Stewart | 183,000 | 192,700 |
| Total | 773,500 | 662,700 |

On brief, respondent accepted that the amounts of compensation that Wertlieb found reasonable for J. Lipsmeyer, M. Lipsmeyer, D. Lipsmeyer, and Stewart were

**[\*23]** reasonable as to each of them and modified the position taken in the notice of deficiency.

      7. <u>Salary Policy of the Taxpayer as to All Employees</u>

Courts have considered the taxpayer's compensation policy for its other employees in deciding whether compensation is reasonable. <u>See</u> <u>Wagner Constr., Inc. v. Commissioner</u>, T.C. Memo. 2001-160. This factor focuses on whether the entity pays top dollar to all of its employees, including both shareholders and nonshareholders. <u>Wagner Constr., Inc. v. Commissioner</u>, T.C. Memo. 2001-160; <u>Eberl's Claim Serv., Inc. v. Commissioner</u>, T.C. Memo. 1999-211 (citing <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1329-1330), <u>aff'd</u>, 249 F.3d 994 (10th Cir. 2001). "[E]vidence of a reasonable, longstanding, consistently applied compensation plan is evidence that the compensation paid in the years in question was reasonable." <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d 1241, 1247 (9th Cir. 1983), <u>rev'g</u> T.C. Memo. 1980-282.

Petitioner's employee handbook, in place since 2002, provides that petitioner's president determined all salary matters and J. Lipsmeyer made the determinations. Petitioner paid bonuses to some of its employees based on how well petitioner was doing financially, employee job performance, and work ethic but did not have a written bonus policy. J. Lipsmeyer determined bonus amounts.

[*24] Evidence of petitioner's contributions to the employee section 401(k) plan, standing alone does not establish that petitioner paid top dollar to all of its employees, including both shareholders and nonshareholders, see, e.g., Eberl's Claim Serv., Inc. v. Commissioner, T.C. Memo. 1999-211, or the existence of a longstanding, consistently applied compensation plan, see, e.g., Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.

8. Compensation Paid in Previous Years

Petitioner argues that the salary history of J. Lipsmeyer, D. Lipsmeyer, M. Lipsmeyer, and Stewart from 2003 through the years in issue demonstrates that the amounts of their compensation were reasonable. However, this factor applies when a corporation is deducting compensation in one year for services rendered in prior years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930). Petitioner has neither argued nor established that any amount of compensation petitioner deducted in either of the years in issue for J. Lipsmeyer, M. Lipsmeyer, D. Lipsmeyer, or Stewart was allocable to services rendered in prior years.

9. Comparison of Salaries With Distributions and Retained Earnings

The absence of dividend payments by a profitable corporation is a factor that may be considered in addressing the reasonableness of compensation. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1326; Charles Schneider

**[*25]** & Co. v. Commissioner, 500 F.2d at 152. Corporations, however, are not required to pay dividends. Owensby & Kritikos, Inc. v Commissioner, 819 F.2d at 1326. The prime indicator of the return a corporation is earning for its investors is the return on equity. Id. at 1326-1327. Petitioner paid J. Lipsmeyer a dividend of $30,000 in each of the years in issue. There is no evidence of return on equity.

  10. Debt Guaranty

Courts have also considered whether an employee personally guaranteed the employer's debt. See R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972); Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153. J. Lipsmeyer and M. Lipsmeyer were co-guarantors of petitioner's $3.3 million line of credit.

We have considered the various factors in assessing the reasonableness of compensation. Factors of employee qualifications for only J. Lipsmeyer and D. Lipsmeyer and the nature, scope, and extent of work for only J. Lipsmeyer and D. Lipsmeyer; salaries compared to distributions and retained earnings; and debt guaranty favor petitioner. Factors of business size and complexity; salaries paid with gross income; prevailing rates of compensation; and employee salary policy favor respondent. Certain other factors are neutral as to only M. Lipsmeyer and Stewart, and other factors are neutral or do not apply. Giving due weight to each of the factors, we have found Wertlieb's report persuasive and we accept his

[*26] conclusions.  Accordingly, we conclude that:  (1) reasonable compensation for the 2006 tax year was $732,300 for J. Lipsmeyer; $134,400 for M. Lipsmeyer; $590,500 for D. Lipsmeyer; and $183,000 for Stewart; and (2) reasonable compensation for the 2007 tax year was $133,500 for M. Lipsmeyer; $470,000 for D. Lipsmeyer; and $192,700 for Stewart.  J. Lipsmeyer's compensation for 2007 is not in issue in this case.

Reasonable Rent

Section 162(a)(3) allows as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property."  In determining whether the payments here in issue were rental payments deductible under this section, the "basic question is * * * whether they were in fact rent instead of something else paid under the guise of rent".  Place v. Commissioner, 17 T.C. 199, 203 (1951), aff'd per curiam, 199 F.2d 373 (6th Cir. 1952).  In connection with a lease between related parties, the inquiry "requires a careful examination of the circumstances surrounding the rental of the property to determine the intentions of the parties in agreeing upon * * * [the] lease and in fixing the terms thereof."  Davis v. Commissioner, 26 T.C. 49, 56 (1956).  The

[*27] question whether payments are rental payments within the meaning of the statute is a question of fact to be resolved on the basis of all the facts and circumstances. Thomas v. Commissioner, 31 T.C. 1009, 1012 (1959); S. Ford Tractor Corp. v. Commissioner, 29 T.C. 833, 842 (1958).

Petitioner contends that the rent amounts paid to Lipspaces, a related party, for each year in issue were reasonable and, therefore, deductible. Respondent argues that petitioner failed to show that any amount of the rental payments in excess of the amounts respondent allowed constitutes reasonable rental deductible under section 162(a)(3).

Both petitioner and respondent rely on expert reports and testimony to support their positions. Petitioner's expert was Joshua A. Smith, senior appraiser, Grubb & Ellis Landauer Valuation Advisory Services, LLC. He is certified by the State of Arkansas as a general real estate appraiser and has been involved in real estate valuation. Respondent's expert was Stephen Cosby, managing director of CBRE, Inc. Valuation & Advisory Services. He is certified by the State of Arkansas as a general real estate appraiser and has over 27 years' experience in real property valuation.

Both experts prepared a market rent analysis that determined market rent based on a percentage return of development cost, including the land acquisition

**[\*28]** cost, for a property of a similar type to the Business Property. Both experts estimated land acquisition cost using the sales approach. We question the comparability of Smith's seven land sales. Unlike the Business Property's "industrial" zoning, four of Smith's properties located in the same area as the Business Property were zoned "commercial". There is no evidence as to Smith's remaining three land sales that the location was feasible for petitioner's business purposes, and none bore the same "industrial" zoning category as the Business Property. Smith testified that he assumed, but did not know, whether any of the land sale prices had been adjusted to take into account property characteristic differences.

Both experts determined the value of a replacement building using the cost approach and Marshall Valuation Service (MVS) data based on square footage of the Business Property. We question the accuracy of Smith's replacement cost and, as a result, his market rent determination. His replacement cost was based on incorrect square footage amounts and on incorrect MVS data. Smith testified that he did not adjust his data and that "[i]n 2006 and 2007, it was a time in the market where costs were increasing * * * and so that period costs would have been substantially higher". Finally, Smith failed to present industrial lease data of any

[*29] kind and offered only that he relied on unspecified "market data for industrial projects of this type". Hence, we accord his opinion little weight.

Cosby estimated land cost based on his review of three land sales, one of which was the Business Property. Although Cosby's sample presents only two sales other than the Business Property, both sales were located within a short distance of the Business Property and both sales bore the same "industrial" zoning designation as the Business Property. He testified that he restricted his search to this area because the Business Property location was "this kind of little light industrial market that's all to itself. * * * [T]here was no city sewer available in that area at the time. And that limited the use of those sites * * * So I wanted to stay within that market segment". He estimated building replacement cost after depreciation based on the stipulated square footage using MVS data in effect as of May 31, 2007. His report indicates that market conditions as of May 31, 2006, were very similar to those conditions as of May 31, 2007, and that there was little difference in rental rates between 2006 and 2007. Although there is no evidence corroborating the similarity of market conditions, based on additional data included in Cosby's report and the relatively short period of time between the tax years in issue, we are persuaded that Cosby's MVS data reflects market conditions during 2006 and 2007.

[*30] Using an 8.5% rate of return, Cosby determined that market rent was $5.05 per square foot per year for the Business Property at 87,897 square feet and was $4.80 per square foot per year at 159,497 square feet. His report indicates that he used an 8.5% rate of return because a typical range of return for a development of the same type as the Business Property was 8%-10% and negotiations between developer and tenant typically would result in a return in the lower end of this range. There is no evidence corroborating his explanation. However, Smith used a 9.5% rate of return, which was within the range Cosby identified as typical. Cosby's report also includes industrial lease data to provide a comparison with, and support for, his market rent determination for the Business Property.

On brief, respondent accepted petitioner's rent deductions in the amounts determined reasonable by Cosby and modified the position taken in the notice of deficiency.

We conclude that Cosby's report is persuasive, and we accept his conclusions. Accordingly, we conclude that: (1) for tax year ended May 31, 2006, petitioner may deduct $443,879.85 Business Property rent ($5.05 x 87,897 ft$^2$); and (2) for tax year ended May 31, 2007, petitioner may deduct $497,497.48 Business Property rent (($5.05 ÷ 12 mos. x 87,897 ft$^2$ x 10 mos.) + ($4.80 ÷ 12 mos. x 159,497 ft$^2$ x 2 mos.)).

**[\*31]** <u>Equitable Recoupment</u>

Petitioner argues that the doctrine of equitable recoupment applies to permit offset of the alleged excess income tax J. Lipsmeyer and M. Lipsmeyer paid on the assumption that the disallowed portions of the compensation and rent were dividends taxable at a lower rate.

As a general rule, the party claiming the benefit of an equitable recoupment defense must establish that it applies. <u>Menard, Inc. v. Commissioner</u>, 130 T.C. 54 (2008); <u>see</u> <u>Estate of Mueller v. Commissioner</u>, 101 T.C. 551, 556 (1993). In order to establish that equitable recoupment applies, a party must prove the following elements: (1) the overpayment or deficiency for which recoupment is sought by way of offset is barred by an expired period of limitation; (2) the time-barred overpayment or deficiency arose out of the same transaction, item, or taxable event as the overpayment or deficiency before the Court; (3) the transaction, item, or taxable event has been inconsistently subjected to two taxes; and (4) if the transaction, item, or taxable event involves two or more taxpayers, there is sufficient identity of interest between the taxpayers subject to the two taxes that the taxpayers should be treated as one. <u>United States v. Dalm</u>, 494 U.S. 596, 604-605 (1990); <u>Menard, Inc. v. Commissioner</u>, 130 T.C. at 62; <u>Estate of</u>

**[\*32]** <u>Branson v. Commissioner</u>, 113 T.C. 6, 15 (1999), <u>aff'd</u>, 264 F.3d 904 (9th Cir. 2001); <u>Estate of Orenstein v. Commissioner</u>, T.C. Memo. 2000-150.

Respondent relies on <u>Catalano v. Commissioner</u>, T.C. Memo. 1998-447, <u>aff'd</u>, 240 F.3d 842 (9th Cir. 2001), as demonstrating that petitioner has not proven the second or fourth elements of equitable recoupment. We agree with respondent's analysis.

In <u>Catalano</u>, an S corporation shareholder leased boats to his corporation, which claimed rent deductions disallowed by the Commissioner. He then claimed that he should not have to include the rental payments in his income because doing so would duplicate his includable S corporation distributable income. In <u>Catalano</u>, we stated:

> The taxable incomes of a shareholder and his S corporation are computed separately, even though the corporation's taxable income is passed through to, and the tax thereon imposed upon, the shareholder. See sec. 1363(a) and (b). This separate computation of taxable income means that the disallowance of a deduction for a lease payment by the lessee-corporation has no impact on the lessor-shareholder's recognition of the lease payment as income. "There is no necessary correlation between the payor's right to a deduction for a payment and the taxability of the payment to the recipient." 1 Mertens, Law of Federal Taxation, sec. 5A.11, at 22 (1998 rev.); see also <u>Smith v. Manning</u>, 189 F.2d 345 (3d Cir. 1951); <u>Sterno Sales Corp. v. United States</u>, 170 Ct. Cl. 506, 345 F.2d 552 (1965); <u>Reynard Corp. v. Commissioner</u>, 30 B.T.A. 451 (1934); <u>Mosby v. Commissioner</u>, T.C. Memo. 1984-90; <u>Zeunen Corp. v. United States</u>, 227 F. Supp. 952 (E.D. Mich. 1964). This separate

[*33] treatment of a payment's deductibility and recognition as income obtains even where the payor and payee are a corporation and its sole shareholder, <u>Reynard Corp. v. Commissioner</u>, <u>supra</u>; <u>Mosby v. Commissioner</u>, <u>supra</u>; a parent corporation and its wholly owned subsidiary, <u>Zeunen Corp. v. United States</u>, <u>supra</u>; or two wholly owned subsidiaries of a common parent. <u>Sterno Sales Corp. v. United States</u>, <u>supra</u>. * * *

In affirming the Tax Court, the Court of Appeals for the Ninth Circuit rejected the taxpayer's invocation of equitable recoupment, stating:

> We need consider only the second element. The doctrine of equitable recoupment does not apply because we do not have inconsistent legal theories. It was not inconsistent for the Tax Court to deny a corporate-level deduction for the lease payments while requiring Catalano to include his receipt of those payments in his individual income. The corporation and Catalano are separate entities. The tax outcome results from the structure Catalano chose for this transaction.

<u>Catalano v. Commissioner</u>, 240 F.3d at 844.

Respondent also argues that "[i]n <u>Catalano</u>, the court found no identity of interest between a sole shareholder and his S corporation; a flow-through entity. T.C. Memo. 1998-447, <u>aff'd</u>, 240 F.3d at 844. Surely then, petitioner, a C corporation, likewise lacks a sufficient identity of interest with its sole shareholder and its sole shareholder's family members." Again we agree with respondent and conclude that petitioner has not established the fourth prerequisite to equitable recoupment. If an S corporation and its shareholder do not have identity of

[*34] interest, a fortiori a C corporation and its shareholder do not have such identity of interest. It would be anomalous to offset the C corporation's liability for corporate income tax by an alleged overpayment of the shareholder's individual income tax.

A corporation formed for legitimate business purposes and its shareholders are separate entities. Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943). A corporation's tax identity is rarely ignored unless it is a sham. See Bennett Paper Corp. v. Commissioner, 699 F.2d 450, 452 (8th Cir. 1983), aff'g 78 T.C. 458 (1982); Crouch v. United States, 692 F.2d 97, 99-100 (10th Cir. 1982); Strong v. Commissioner, 66 T.C. 12, 22-23 (1976), aff'd without published opinion, 553 F.2d 94 (2d Cir. 1977). As we noted in Bass v. Commissioner, 50 T.C. 595, 601 (1968):

> Long ago, the Supreme Court held that when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail makes no difference tax-wise, observing that "Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually". National Carbide Corp. v. Commissioner, * * * [336 U.S. 422,] 433 [1949]; see Chelsea Products, Inc. [v. Commissioner], 16 T.C. 840, 851 (1951), affd. 197 F.2d 620 (C.A. 3, 1952).

[*35]  Petitioner has not cited any precedential or persuasive authority that contradicts the well-established separation between the corporation and the Lipsmeyers for tax purposes.  We hold that equitable recoupment does not apply to petitioner's situation.

In reaching our conclusions, we have considered all arguments made by the parties and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect differences between the statutory notice allowances and respondent's modifications of that notice,

Decision will be entered

under Rule 155.